IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| DEBORAH BEARER | : | CIVIL ACTION No.: 19-5415 |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| TEVA PHARMACEUTICALS | : | |
| USA, INC, et al. | : | |
| Defendants | : | |

## <u>MEMORANDUM OPINION</u>

DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE                              September 8, 2021

Presently before the Court is Defendants' Teva Pharmaceuticals USA, Inc., Teva Sales and Marketing, Inc., and Teva Branded Pharmaceuticals Products R&D, Inc. (collectively "Teva") Motion for Summary Judgment. (Doc. 52.) Plaintiff Deborah Bearer ("Bearer") brought this action against Teva alleging claims of age and gender discrimination and retaliation pursuant to the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq*. ("ADEA"), Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000, *et seq*. ("Title VII"), and the Pennsylvania Human Relations Act, as amended, 43 P.S. § 951, *et seq*. ("PHRA"). *See generally* Pl.'s Am. Compl. (Doc. 28).

1

## TABLE OF CONTENTS

I.   BACKGROUND ............................................................................................... 3

  A.   Specific Incidents of Discrimination and Harassment ................................. 4

  B.   "Boys' Club" and "Glass Ceiling" Work Environment ............................... 10

II.  LEGAL STANDARD ..................................................................................... 11

III. DISCUSSION ................................................................................................. 12

  A.   Discrimination and Retaliation ................................................................ 13

    1.   Untimely claims ................................................................................. 14

    2.   Timely claims .................................................................................... 16

      a.   Ongoing failure to promote within current role ............................... 18

        i.   Adverse action ............................................................................ 19

        ii.   Legitimate Nondiscriminatory Reason ........................................ 21

        iii.   Pretext ....................................................................................... 22

      b.   Pricing project that did not result in a Senior Director position ........ 24

      c.   Removal of Senior Director of Global Payer Marketing position ....... 29

      d.   Foote's promotion to director following Mauk's departure ............. 31

      e.   Nonreceipt of President's Club Award ........................................... 37

        i.   Adverse Action ........................................................................... 39

        ii.   Legitimate Nondiscriminatory Reason ........................................ 45

        iii.   Pretext ....................................................................................... 47

  B.   Hostile Work Environment ....................................................................... 51

    1.   Non-harassing conduct that does not contribute to hostile work environment .... 53

    2.   Conduct that contributes to hostile work environment .......................... 55

IV.  CONCLUSION ............................................................................................... 61

Bearer is a 63-year-old woman who presently serves as Senior Director of Global Market Access at Teva, a pharmaceutical company. Bearer Dep. 12:17. She holds a bachelor's degree in business administration. In 2003, she was recruited by Teva's predecessor, Cephalon, Inc. ("Cephalon"), and worked principally in merchandizing. She came to be an employee of Teva in 2011, following Teva's acquisition of Cephalon. (Doc. 52-13.) As of November 2019, when she filed this lawsuit, Bearer had over sixteen years of combined experience at Teva and its predecessor. *Id*. She is still employed by Teva to this day. *Id*.

Bearer alleges that in the course of her employment with Teva, she was repeatedly passed over for promotions, denied the opportunity for additional work responsibilities, and experienced a work environment that was hostile to the professional advancement of women. She brings claims of age and gender discrimination and retaliation against her employer, which are the subject of Defendants' motion for summary judgment.

## I.    BACKGROUND

Bearer's claims generally arise from her allegations that "Defendants made no effort to promote [her] to a Senior Director position," that she was "passed . . . over for open opportunities in favor of less qualified male [and/or younger] employees," and that Teva "failed to advocate for [her] career advancement in the way that they did for male employees," and otherwise created a hostile work environment. *See generally* Doc. 62. She attributes these alleged failures to the existence of a "glass ceiling" for women at Teva, as well as what she refers to interchangeably as a "boys' club," an "old boys' club," and an "old boys' network." Because the parties have raised questions with respect to the timeliness of Bearer's claims, we provide a chronological narrative of the specific incidents of discrimination or harassment Bearer alleges. Then we briefly discuss

her general allegations of the existence of a "boys' club" and a "glass ceiling," which she asserts should serve as the "backdrop" against which we should view those specific incidents.

## A.  Specific Incidents of Discrimination and Harassment

Bearer became employed by Teva in October 2011, following Teva's acquisition of Cephalon, where she had been employed as a Director in "CNS Managed Markets Marketing" in Cephalon's Frazer, Pennsylvania office. *Def. Statement of Undisputed Facts* ¶ 29 (Doc. 52-4). Following this acquisition, Bearer joined Teva's Market Access Group, where she "retained the same job title and responsibilities and continued working on the same projects" in the same office location. *Id.* ¶ 30. Throughout her employment, Bearer, who carried the title and responsibilities of a "Director," made it clear to her superiors at Teva that she was interested in advancing to the level of "Senior Director."[1] *Pl. Resp. to Def. Statement of Undisputed Facts* ¶ 40 (Doc. 62-3).

Bearer's first manager at Teva was John Zabroske, a Senior Director in the Health Systems Marketing group. *Pl. Add'l Statement of Undisputed Facts* ¶ 59, 68, 70 (Doc. 62-4). In October 2015, Bearer learned that Zabroske was leaving his position and that Bryan Mauk, a male and younger than her, had been selected to be his successor. *Id.* at 65. The position had not, however, been posted to Teva's internal job board, leaving other candidates unable to apply and be considered for the job.[2] *Id.* at 69, 71. Upon learning that Mauk had been selected, Bearer expressed

---

[1] The role of "Senior Director" is one of the highest positions within Teva's Market Access hierarchy and carries with it the responsibility of overseeing various subordinates in Market Access's subdivisions. (Doc. 52-12.) Further, "your benefits and compensation are higher as a senior director level in general than [a] director [level]." Bearer Dep. 213:16-19.

[2] Teva's Recruitment and Selection Policy, effective June 19, 2017, states that for internal recruitment, "all opportunities up to and including salary grade 17 will be posted for a minimum of five (5) working days internally and may remained posted until a candidate has been selected…[t]he hiring manager may post a salary grade 18 position; however, this is not required under this guideline. There may be times when a Hiring Manager may promote an employee within the department into a vacancy without posting the vacancy. However, before doing so, a Hiring

to Zabroske her disappointment that she did not have the opportunity to apply. *Id.* at 71. After she informed Zabroske that she wanted that opportunity, the position was posted, this time as a "Senior Director/Director" position. *Id.* at 77. Bearer applied and was interviewed by George Keefe, a male, then Teva's Vice President of Market Access. *Id.* at 17; *Def. Statement of Undisputed Facts* ¶ 21 (Doc. 52-4). During the interview, Bearer expressed to Keefe that she felt that there was a "glass ceiling" and an "old boys' network" in the organization. *Pl. Add'l Statement of Undisputed Facts* ¶ 83 (Doc. 62-4). In January 2016, following that interview, Zabroske informed Bearer that Mauk had again been selected for the position.[3] *Id.* at 91; *Pl. Am. Compl.* at 37 (Doc. 28). Although Zabroske had held the position as a Senior Director, it was classified only as a Director-level position for Mauk. *Pl. Add'l Statement of Undisputed Facts* ¶ 94 (Doc. 62-4). Despite technically being on the same hierarchical level, Mauk became Bearer's direct supervisor, creating a situation in which she was a "Director reporting to a Director." *Def. Statement of Undisputed Facts* ¶ 57 (Doc. 52-4). Bearer has characterized that decision to not select her as, "one of the most discriminatory acts to which she had been subjected to." *Pl. Add'l Statement of Undisputed Facts* ¶ 74.

In July 2016, Bearer applied and interviewed for a Senior Director position in Teva's newly created Global Health Ecosystems group. *Id.* ¶ 119. Along with others, she interviewed with Mike

---

Manager should review and document all potential candidates for the opening within that department and determine their qualifications and potential before reviewing with the HR Business Partner/HRM and selecting a candidate." (Doc. 52-15.) We are unaware of Teva's internal hiring policy from any date prior to June 19, 2017.  We are also unaware of the "salary grades" of Director or Senior Director positions at Teva.

[3] Bearer was qualified for the position that was vacated by Zabroske, into which Mauk was promoted. (Doc. 62-4 ¶ 93.) She was also qualified for the Senior Director of Global Health Ecosystems position into which Kathryn Sweeney was eventually promoted (*Id.* ¶ 123), and for the Director of Global Health Ecosystems position, which Vincent Loucks received. (Doc. 62-3 ¶ 90.) Indeed, Bearer's qualifications for any of the positions she sought does not seem to be at issue.

Derkacz, then the "Head of Teva's Global Neuroscience Group," and with Marty Berndt, a male, then Teva's Senior Vice President of Global Health Ecosystems and the primary decisionmaker in the hiring process. *Id.* at 120; *Def. Statement of Undisputed Facts* ¶ 8 (Doc. 52-4). Despite her understanding that she was a "shoo-in," Bearer was not selected for the position. Instead, Kathryn Sweeney, who is female and younger than Bearer, was hired, in part due because Derkacz recommended her to Berndt. *Pl. Add'l Statement of Undisputed Facts* ¶ 121–124, 127. Bearer was "shocked and distraught" that she was not selected for the position.[4] *Id.*

In September 2016, upon Derkacz's suggestion that she pursue opportunities in "pricing," Bearer agreed to assist with a global pricing project in the Global Health Ecosystems group, which was headed by Berndt, while simultaneously retaining her responsibilities in her current role. *Pl. Add'l Statement of Undisputed Facts* ¶ 155 (Doc. 62-4). Bearer worked on the project for seven months, until March 2017, during which time she was under the direct supervision of Simon Brooks, who reported to Berndt. *Id.* ¶ 158; *Am. Compl.* ¶ 54. After approximately "two to three months" on the project, Brooks informed her that if she wanted to join the pricing group, the "job is yours." *Def. Statement of Undisputed Facts* ¶ 102 (Doc. 62-3). Bearer explained that she was not interested in joining the group in a lateral role as a Director and would only accept a position as a Senior Director. *Pl. Add'l Statement of Undisputed Facts* ¶ 156. Brooks agreed that it would be appropriate for her to join as a Senior Director, but he did not have authority to create a Senior

---

[4] Further, in November 2016, Bearer learned that Vincent Loucks, who is male and younger than her, was hired for the position of Director of Global Health Ecosystems. *Def. Statement of Undisputed Facts* ¶ 90 (Doc. 62-3); *Am. Compl.* ¶ 47 (Doc. 28). At the time he was hired, he was an Associate Director at Teva, which is one level below a Director. *Def. Statement of Undisputed Facts* ¶ 90 (Doc. 62-3). The Director position into which he was hired was posted on Teva's internal job board. *Id.* ¶ 92. Bearer did not apply for the position. *Id.* She testified that she did not apply for the position because she was not aware of its opening because she did not "scour the website" in search of an open position, and because she expected that Berndt would have informed her "as new opportunities in his group became available because of her qualifications." *Id.*

Director position. *Def. Statement of Undisputed Facts* ¶ 102 (Doc. 62-3). He discussed Bearer's desire to join as a Senior Director with his superior, Berndt, but Berndt ultimately informed Bearer that the position could only be posted as a Director. *Id.* She was offered the Director-level position that was posted, but declined it because she was only interested in a Senior Director position. *Id.*

In June 2017, Bearer learned that a new Senior Director position in Global Payer Marketing had been posted and that "a substantially younger male candidate" had been interviewed for it. *Am. Compl.* ¶ 64. She then applied for the position. *Id.* ¶ 69. However, in July 2017, before she was interviewed, the posting was removed, and a decision was made not to fill it at all. (Doc. 62-3 ¶ 122.) That decision was made by Larry Downey, George Keefe, and Aaron Deves, all males. (*Id.*) Mr. Keefe claimed in his deposition that the position was removed because he believed the role would have "significantly overlapped" with Bearer's then-position, and for that reason, he did not think the role should exist. *See* Keefe Dep 248:17-249:20.

In September 2017, Bearer attended a work conference in Vancouver, Canada. (Doc. 62-4 ¶ 165.) At a cocktail reception at the conference, she approached Rob Koremans, Teva's President and CEO of Global Specialty Medicines, who was at the time one of Teva's highest ranking executives. *Id.* ¶ 166. She intended to introduce Koremans to an employee who reported to her, Yousseff Khan. *Id.* After Bearer, Koremans, and Khan spoke "for a few minutes," she and Khan turned to walk away, and "Koremans slapped [her] on the butt." *Id.* ¶ 167. The "slap was 'very, very firm' and audible." *Id.* ¶ 168 (quoting Pl. Dep. 371:15–21). The following day, Bearer was in a conference with Koremans and other employees, and "he looked at her, made eye contact with her, and then winked at her." *Id.* ¶ 171.

During the week following the Vancouver conference, Bearer complained to Human Resources about Koremans' conduct at the conference and generally about Teva's failure to

promote her due to the "glass ceiling" for women. (Doc. 62-3 at 132.) She then had several meetings and exchanged emails with HR representatives investigating both her specific claim against Koremans and her claim regarding the "glass ceiling" and the failure to promote. (Doc 62-4 ¶ 178–186.) In early-November 2017, Bearer was asked "what she wanted in connection with her complaints," and she requested that Teva "address its culture of sexual harassment and sex discrimination, promote her to Senior Director, and that Koremans not attend an upcoming meeting at which [she] was scheduled to make a presentation, as his presence would cause her serious stress and discomfort." *Am. Compl.* ¶ 86–87; *Def. Am. Answer* ¶ 86–87 (Doc. 60); Doc. 62-4 ¶ 187, 189. Despite Bearer's request, Koremans attended the meeting and was in the audience during her presentation. *Am. Compl.* ¶ 89; *Def. Am. Answer* ¶ 89 (Doc. 60). On December 11, 2017, Bearer dual-filed her first Charge of Discrimination against Teva with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC") alleging gender and age discrimination, hostile work environment based on her gender and age, and retaliation. Teva concluded its investigation into the Koremans incident at that time, believing its investigation to be "duplicative and unnecessary because Plaintiff had [filed her Charge of Discrimination]," and because it had recently been announced that Koremans was departing the company. Doc. 60 ¶ 91.

In December 2017, Mauk, who was Bearer's direct supervisor, was promoted, creating a vacancy within her group. (Doc. 62-4 ¶ 160–61; Doc. 62-3 ¶ 139.) Bearer expressed interest in assuming Mauk's vacated position, as her understanding was that assuming that role would result in a promotion to Senior Director. (Doc. 62-3 ¶ 139.) However, following Mauk's departure, the role was restructured such that, as to Bearer, it would no longer be supervisory. *Id.* Instead, Teva promoted Adam Foote, a male and younger than Bearer, into a Director-level position that was

equal to Bearer's in the group's hierarchy. (Doc. 62-3 ¶ 140–41; Doc. 62-4 ¶ 161.) While Foote was given more direct reports than her, Bearer's responsibilities did not change with Foote's promotion, and she retained leadership over the project and team she had previously been working with. (Doc. 62-3 ¶ 140; Doc. 62-4 ¶ 164.)

In February 2018, Bearer was not selected for Teva's President's Club Award. (Doc. 62-4 ¶ 207.) The award is considered "very prestigious," and "[w]inners receive a trip with a partner, a crystal bowl, and a cash award of about $5,000." *Id.* Nomination for the Award requires an employee's performance to be considered "exceptional," and the selection process "is not solely based on quantitative parameters and metrics." (Doc. 62-3 ¶ 152.) The selection of award recipient is determined by a committee that is made up of the Market Access group leadership and headed by George Keefe.  Keefe Dep. 286:8-15. "By its nature," the selection process is "subjective" and "is not a perfect science and final selections are always very difficult." (Doc. 62-3 ¶ 152–53.) Bearer has no knowledge as to whether she was nominated for the award by a supervisor or by any of her peers, as that information was kept confidential. Bearer Dep. 408:21-409:2. Ultimately, two employees who are both male and younger than Bearer were selected for the Award. (Doc. 62-4 at 213–16.)

On May 1, 2018, Bearer dual-filed her second Charge of Discrimination against Teva with the EEOC and PHRC. (Doc. 62-3 ¶ 138.) This Charge contained new allegations of gender and age discrimination, including the creation of a hostile work environment based on her gender and age and retaliation. Bearer applied and was interviewed for a Senior Director position within the Market Access group in December 2018, and she was selected for and promoted to that position in January 2019. (Doc. 62-3 ¶ 172.) She continues to be employed in that position. (*Id.*)

### B.  "Boys' Club" and "Glass Ceiling" Work Environment

Bearer asserts that the allegedly discriminatory conduct to which she was subjected is the result of the existence of a "boys' club" and a "glass ceiling" for women, and that we should view her allegations of discrimination against that "backdrop." She described the "boys' club" as being made up of the "all-male leadership team" and explained that she "felt" excluded "due to their demonstrably close-knit interactions and discussions only among male managers in which she was not included."[5] (Doc. 62 at 12.) When Bearer first joined Teva following its acquisition of Cephalon, she "initially thought that her feelings of exclusion were based on cultural integration issues," as the men in the leadership team had worked together for years and had a "familiarity" with each other, but not with her, as she had only recently joined Teva. (Doc. 62-4 ¶ 61.) Yet "it became clear to her over the years that there was an old boys' network at Defendants." *Id.* She alleges that the "old boys' club" was characterized by "camaraderie" and "familiarity" among the "young male" leadership team. *Id.* ¶ 224. She further explained that the "young males . . . were sort of in the clique, if you will, at meetings and what have you." *Id.* That is, during "break time" at meetings "they would break and go off together and talk, and it was clear that they were very familiar with one another and worked together[, and they were] exclusive to the extent that [she] didn't feel comfortable approaching them." (Doc. 62-3 ¶ 39.) Bearer recounted a specific situation where she was at a meeting in which there were conversations with the male managers about issues about which she had no part or knowledge. (Doc. 62-4 ¶ 63.) In addition to the general camaraderie and exclusivity that characterized the boys' club, Bearer alleges that it resulted in men, but not her, being "tapped on the shoulder for opportunities that would help them expand their knowledge,

---

[5] In her deposition, Bearer identified the specific members of the "boys' club" as: Larry Downey, Brendan O'Grady, George Keefe, John Zabroske, Bryan Mauk, Adam Foote, Marty Berndt, and John Miller. *See* Bearer Dep. 35:7-37:22.

develop their skill sets, and take on higher-level opportunities within the company." (Doc. 62 at 24.)

Relatedly, Bearer asserts that there was a "glass ceiling" for women and for her in particular. She explained "glass ceiling" to mean that "opportunities for advancement for women come to a standstill while there are still many other opportunities for men to climb the corporate ladder." *Id.* at 12. She further testified that the "glass ceiling" is visible "in terms of the diversity ratio that you look at as far as leadership in the organization relative to the male versus female." (Doc. 62-4 ¶ 87.) She asserts that several other women at Teva, "too many to name," agreed about the existence of a "boys' club" and a "glass ceiling."[6] *Id.* ¶ 224. Bearer considers the allegedly discriminatory conduct to which she was subjected to be "the culmination" of the "boys' club" and the "glass ceiling."

## II.   LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). In evaluating a summary judgment motion, the court must "view the facts and draw reasonable inferences in the

---

[6] Bearer alleged in her Complaint at the outset of this matter that, "Females are underrepresented at the leadership levels of Defendants. By way of example only, out of twelve (12) Corporate Officers identified on Defendants' website, only two are female." (Doc. 1 at ¶ 25.) Many of the alleged members of the "boys' club" have never, or rarely ever, been under female supervision while at Teva. Throughout Marty Berndt's employment with Teva, starting in 1997, he has only reported to one female supervisor. (Doc. 62-4 at ¶ 15). George Keefe began working at Teva in 2002 and has had only had one female supervisor, who ended up reporting to him several years later. (*Id.* at ¶ 19-20.) Bryan Mauk has reported to only one woman during his employment at Teva, which began in 2003. (*Id.* at ¶ 21-22.) Brendan O'Grady, who started in 2001, has never reported to a woman in the course of his employment with Teva. (*Id.* at ¶ 23.) Larry Downey worked at Teva from 2001 to 2018 and never reported to a woman supervisor. (*Id.* at ¶ 6). Downey further testified that multiple female employees expressed to him that Teva was a "boys' club." (*Id.* at ¶ 24-25, 28.) Downey admitted that when he heard this feedback from multiple female employees, he immediately determined it was not true, because he did not think that was the case from his own experience. (*Id.* at ¶ 26-27.)

light most favorable to the party opposing the summary judgment." *Scott v. Harris*, 550 U.S. 372, 378 (2007) (internal quotations and alterations omitted). "A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of [its] burden of proof." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citations omitted). However, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir.2010). "The non-moving party has the burden of producing evidence to establish prima facie each element of its claim." *Schaar v. Lehigh Valley Health Servs., Inc.*, 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 319 (1986)). In turn, "the moving party need only show that the non-moving party 'has failed to produce evidence sufficient to establish the existence of an element essential to its case' in order to obtain summary judgment." *A. Natterman & Cie GmbH v. Bayer Corp.*, 428 F. Supp. 2d 253, 257 (E.D. Pa. 2006) (quoting *Alvord–Polk, Inc. v. Schumacher & Co.*, 37 F.3d 996, 1000 (3d Cir.1994)).

## III.   DISCUSSION

Given the record discussed above, Bearer asserts that she was discriminated against by Teva's failure to promote her, award her, and provide opportunities for career advancement; that she suffered from a hostile work environment; and that she was retaliated against for engaging in protected activity. As an initial matter, Teva contends that many of the incidents underlying these claims are time barred in that Bearer did not file her EEOC and/or PHRC charges within the applicable limitations period. Teva then contends that her timely allegations cannot sustain discrimination or retaliation claims as they do not constitute "adverse actions," or even if they do, they were neither discriminatory nor retaliatory. Further, it contends that her allegations cannot

sustain a hostile work environment claim in that the conduct to which she was subjected was not "severe or pervasive." We first discuss the timeliness of Bearer's claims to narrow our review to only those allegations that were timely asserted. Next, we review her failure to promote, hostile work environment, and retaliation claims separately.

Bearer's allegations include claims of sex discrimination, hostile work environment, and retaliation. However, her complaint does not specify which allegations are meant to support each of these claims. Accordingly, we undertake a close review of her brief in opposition to the motion in order to glean from her which allegations she believes support the various claims.

### A.  Discrimination and Retaliation

In her opposition brief, Bearer identifies four categories of allegations that make up her sex discrimination and retaliation claims. These are that Defendants: (1) "made no effort to promote Plaintiff to a Senior Director position (despite the fact that they promoted male employees into higher-level positions without them applying for the same);" (2) "passed Plaintiff over for open opportunities in favor of less qualified male employees;" (3) "failed to advocate for Plaintiff's career advancement in the way that they did for male employees;" and (4) "denied Plaintiff the President's Club Award while selecting male employees for the same." (Doc. 62 at 19, 23, 24, 27.) The first category is predicated on Bearer's allegation of an ongoing failure to promote that persisted "throughout her employment." (*Id.* at 19.) The second category includes Mauk's January 2016 promotion into a position for which she had applied, and Foote's December 2017 promotion into a position for which she did not apply. (*Id.* at 23–24.) The third category includes Loucks' November 2016 promotion into a position for which she did not apply but for which Teva was allegedly "well aware of her interest," and her work on the global pricing project which did not result in an offer for a Senior Director position in February 2017. The fourth category includes

only her February 2018 nonreceipt of the President's Club Award. In addition to these claims of sex discrimination, she alleges age discrimination based upon the same grounds as her sex discrimination claims, as well as one additional incident—the July 2016 promotion of Kathryn Sweeney to a position for which Bearer had applied.

Teva contends that several of these incidents cannot support timely claims in that they are barred by the statute of limitations. Next, it contends that her allegations, whether timely or untimely, cannot support discrimination claims on their merits. We first determine which claims are timely brought and dispose of those which we conclude are time-barred claims. We then assess the merits of the timely-filed claims.

### 1.    Untimely claims

Title VII and the ADEA require a claimant in Pennsylvania to file a charge with the EEOC within 300 days of an unlawful employment practice. *See Mikula v. Allegheny Cty. Of PA*, 583 F.3d 181, 183 (3d Cir. 2009) (citing 42 U.S.C. § 2000e–5(e)(1)) (Title VII); *Ruehl v. Viacom, Inc.*, 500 F.3d 375, 382–83 (3d Cir. 2007) (citing 29 U.S.C. § 626(d)) (ADEA). Similarly, "[t]o bring suit under the PHRA, an administrative complaint must first be filed with the PHRC within 180 days of the alleged act of discrimination." *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 164 (3d Cir. 2013) (citing 43 Pa. Stat. § 959(h)). Here, Bearer dual-filed her first charge with the EEOC and PHRC on December 11, 2017. (Doc. 52-20.) Accordingly, as Teva contends and Bearer does not dispute, the statutory period extends back to February 14, 2017 (300 days) for federal claims, and to June 14, 2017 (180 days) for state claims. Teva therefore argues that Mauk's January 2016

promotion, Sweeney's July 2016 promotion, and Loucks' November 2016 promotion cannot support timely discrimination claims.[7]

In response, Bearer concedes that these untimely allegations are not actionable discrimination claims, but she maintains that they nonetheless may be considered as "background evidence." (Doc. 62 at 23 n.22 & 33 n.33.) Indeed, "prior acts that are not actionable because they are time-barred may still be cited as background evidence in support of a timely claim." *Titus-Morris v. Banc of Am. Card Servicing Corp.*, 512 F. App'x 213, 217 (3d Cir. 2013) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)). Accordingly, her discrimination claims predicated upon Mauk's January 2016 promotion, Sweeney's July 2016 promotion, and Loucks' November 2016 promotion are *dismissed as untimely*.[8] These allegations may, however, be considered as "background evidence," which may be utilized to "establish[] the discriminatory

---

[7] We note that Teva has challenged not only whether these incidents can support timely discrimination and retaliation claims, but also whether they can support Bearer's claims of hostile work environment. However, we address those timeliness concerns below, as there may be different timeliness considerations for those claims. *See Green v. Brennan*, 136 S. Ct. 1769, 1781 n.7 (2016) ("The analysis for the limitations period turns on the nature of the specific legal claim at issue."). Accordingly, our timeliness discussion here pertains only to her discrimination and retaliation claims.

[8] We further note that while Teva has not challenged its timeliness, Bearer's discrimination claim based on her nonreceipt of a Senior Director position following her work on the global pricing project is potentially untimely. Indeed, Bearer alleged in her amended complaint that she was informed that she would not be promoted to Senior Director "in or about February 2017." (Doc. 28 at 56.) As set out above, the time-bar for her federal claims is February 14, 2017, and June 14, 2017 for her PHRA claims. There is no further specificity provided in the parties' filings as to the exact date she learned she would not be offered a Senior Director position. It is thus unclear whether this incident occurred prior to the February 14, 2017 Title VII time-bar. As such, we cannot dismiss it on summary judgment on this basis. However, Bearer alleges that she worked on the global pricing project until March 2017, and that she learned that she would not be offered a Senior Director position "at some point" prior to the conclusion of her work on the project. (Doc. 62-4 at 157–59.) This incident therefore occurred prior to the June 14, 2017 PHRA time-bar and is not an actionable claim pursuant to that statute. Accordingly, this claim is dismissed as untimely pursuant to the PHRA, but we proceed for the purposes of this motion under the assumption that it may be viable under Title VII.

nature of the timely claims" by showing "motive [or] intent" but which cannot, due to its lack of timeliness, establish an independent claim of sex discrimination. *Mavrinac v. Emergency Med. Ass'n of Pittsburgh* 2007 WL 2908007, at *12 (W.D. Pa. Oct. 2, 2007) (citing *Morgan*, 536 U.S. at 113).

### 2. Timely claims

Having disposed of her untimely claims, Bearer's remaining sex discrimination and retaliation claims are narrowed to those predicated upon the following incidents: (a) the alleged ongoing failure to promote Bearer within her current role, (b) her work on the special pricing project that did not result in a Senior Director position offer, (c) the July 2017 removal of the posting for the Senior Director of Global Payer Marketing position, (d) Foote's December 2017 promotion, and (e) her nonreceipt of the President's Club Award in February 2018. Teva argues that none of these incidents support a claim of sex discrimination, as it contends that they neither constitute "adverse actions" nor give rise to an inference of intentional discrimination. We first set out the relevant legal standards and then address each claim in turn.

We analyze Bearer's claims according to the familiar burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *See, e.g.*, *Burton v. Teleflex Inc.*, 707 F.3d 417, 425–26, 432 (3d Cir. 2013). "Under the first step in the *McDonnell Douglas* analysis, the plaintiff bears the burden of making out a prima facie case of discrimination." *Id.* at 426. To make a prima facie showing of discrimination, Bearer must show that: (1) she was a member of the protected class, (2) was qualified for the position, and (3) suffered an adverse employment action, (4) under circumstances giving rise to an inference of intentional discrimination. *Id.* at 426 (citations omitted). Similarly, to make out a prima facie showing of

retaliation, Bearer must demonstrate that: (1) she engaged in activity protected by Title VII,[9] (2) the employer took an adverse employment action against her, and (3) there was a causal connection between her participation in the protected activity and the adverse employment action. *Young v. City of Philadelphia Police Dep't*, 651 Fed. App'x. 90, 95 (3d Cir. 2016).

Once a plaintiff establishes a prima facie case, the burden shifts to the defendant to "offer a legitimate non-discriminatory justification for the adverse employment action." *Id.* (citations and quotations omitted). The defendant's burden at this stage is "'relatively light' and is satisfied if the employer provides evidence, which, if true, would permit a conclusion that it took the adverse action for a non-discriminatory reason." *Id.* (quoting *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994)). That is, "the defendant need not prove that the articulated reason actually motivated its conduct." *Id.* (quoting *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 189 (3d Cir. 2003)) (internal quotations omitted).

Finally, if the defendant articulates a legitimate non-discriminatory reason, the burden shifts back to the plaintiff "to provide evidence from which a factfinder could reasonably infer that the employer's proffered justification is merely a pretext for discrimination." *Id.* To make this showing, "the plaintiff must point to some evidence . . . from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* (quoting *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994)).

---

[9] We note that Bearer argues that she was constantly engaged in protected activity, as she complained on several occasions to her superiors that she felt there was a "boys' club" and "glass ceiling" at Teva. (Doc. 62 at 39.) Teva does not challenge this prong of the prima facie case, so it is unnecessary for us to address it.

### a. Ongoing failure to promote within current role

This claim is predicated on Bearer's allegations that "[t]hroughout her employment, [she] made Defendants well aware of her interest in taking on new opportunities, expanding her responsibilities, and advancing within the company to the next level [*i.e.*, Senior Director], in **any** capacity."[10] (Doc. 62 at 19.) She argues that Teva "could have simply given [her] more responsibility within her current role in order to promote her to Senior Director," as was allegedly done "for at least one male employee [Marty Berndt],"[11] and that it was discriminatory for them to have failed to do so.[12] (*Id.* at 20.) That is, she argues that in her role as a Director in the Market Access group, Teva could have assigned her more responsibilities so as to change the position in a Senior Director level job. In response, Teva first contends that its failure to promote Bearer to a Senior Director within her current role does not constitute an "adverse action" and that, even if it were an adverse action, Teva has put forth a legitimate nondiscriminatory reason for its conduct. (Doc. 52 at 14–15; Doc. 63 at 8–9.) We conclude that, viewing the facts in the light most favorable

---

[10] While Bearer alleges that this claim continued throughout her employment, it is timely only to the extent that it occurred within the limitations period, i.e., after February 14, 2017 for federal claims and June 14, 2017 for state claims. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 – 115 (2002) (explaining that "discrete acts," such as failure to promote, are not subject to the continuing violations doctrine and are timely only where they have occurred within the limitations period).

[11] Berndt testified that Downey had promoted him from Director to Senior Director. (Doc. 62 at 20.) Berndt did not apply for the position, rather, he described the move as a "progressive promotion within the role." (*Id.*)

[12] While we acknowledge that Bearer stated in her brief that ongoing failure to promote claim is "not limited to" the failure to promote her within her role, she simply has not identified any other positions into which she should have been, but was not, promoted. We reject any implied invitation to speculate as to other promotions that Bearer might believe she should have received based on her generalized expression of desire for career advancement. Thus, we construe this claim to refer only to her failure to be promoted "within her current role."

to Bearer, a reasonable jury could find that Teva's failure to promote her within her role constitutes unlawful discrimination.

### i.   Adverse action

An adverse employment action for purposes of Title VII discrimination claims is "an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 326 (3d Cir. 2015). In the retaliation context, the adverse action standard is broader and encompasses any "actions [that are] 'materially adverse' in that they 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Moore v. City of Philadelphia*, 461 F.3d 331, 341 (3d Cir. 2006) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, (2006)). To be sure, in either context, "firing, *failing to promote*, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits" are such adverse actions. *Remp v. Alcon Labs., Inc.*, 701 F. App'x 103, 106–07 (3d Cir. 2017). However, failure to create a new position and promote the plaintiff into that role is not an adverse action for the purposes of either a discrimination or retaliation claim. *Young v. Temple Univ. Hosp.*, 359 F. App'x 304, 310 (3d Cir. 2009).

Here, Teva argues that Bearer's allegation does not constitute an adverse action in that this failure to promote claim is predicated upon her desire to advance into a position that did not exist. (Doc. 63 at 8–9.) As such, it contends that a new position would have needed to be created in order to promote her into it, and that the failure to create a new position for her "does not result in an adverse action." (*Id.* at 9.) While we acknowledge the Third Circuit's ruling in *Young* and accept that generally a failure to create a new position does not constitute an adverse action, we are not persuaded that the facts here necessarily fit within that general rule. Indeed, although Teva

maintains that it would have needed to "create" a new Senior Director position to promote Bearer, it simultaneously characterizes her request as one simply "to boost [her] title," (Doc. 52 at 15), which could have been accomplished by giving her "more responsibility within her [current] position." (Doc. 63 at 8.)

This latter characterization describes a scenario not where Teva would have needed to "create" a new position that "did not exist," but rather one where the position already existed (*i.e.*, her current position) and Teva needed only to assign her more responsibility so that the gradation *of that current position* could be changed to a Senior Director.[13] Such a scenario is distinguishable from the one the Third Circuit addressed in *Young*. There, the plaintiff requested a promotion to a position that entirely did not exist, and in fact had never existed, at the defendant's hospital. *Young*, 359 F. App'x at 306. Here, by contrast, a Senior Director position in the Market Access group previously existed, and in fact had been held by Bearer's previous supervisor, Zabroske. Thus, it cannot be said that, as a matter of law, Teva's failure to promote Bearer within her then-current role was a "failure to create a new position" of the kind that our Court of Appeals has held is not an adverse action. Rather, we conclude that a reasonable jury could find that the circumstances before us amount to a failure to promote, which is a quintessential form of adverse action.[14]

---

[13] Indeed, Larry Downey testified that it could have been possible for Teva to have promoted Bearer by these means. Downey Dep. 160:11–15.

[14] We note that Teva does not appear to challenge any other prongs of the prima facie case except the adverse action requirement. (*See* Doc. 52 at 15 (arguing that if Bearer could establish an adverse action on this claim, that it should still fail because her "allegations . . . are insufficient to rebut the legitimate nondiscriminatory reason," rather than arguing that her claim should fail because she has not established some other element of the prima facie case)). Still, we observe that Bearer has presented at least enough evidence to permit a jury to find that her non-promotion occurred under circumstances giving rise to an inference of discrimination, in satisfaction of the final prong of the prima facie case. Indeed, while a plaintiff in a failure to promote claim typically must establish this inference by demonstrating that, after she was denied the promotion, the defendant filled the position "with someone outside of the protected class or continued to seek

Accordingly, we find that she has satisfied her burden to make out a prima facie case of discrimination failure to promote. Conversely, we find that Bearer has not made out a prima facie case of retaliation as it relates to these same facts. Indeed, she has not presented any argument or evidence whatsoever to causally connect her failure to be promoted within her then-current role to any protected activity in which she may have engaged, as is required to support a prima facie case of retaliation. Accordingly, summary judgment is granted as to her retaliation claim on this point.

### ii.   Legitimate Nondiscriminatory Reason

At the next step of the *McDonnell Douglas* analysis, the burden shifts to Teva to articulate a legitimate nondiscriminatory reason for its failure to promote Bearer within her current role to a Senior Director level. On this point, Teva asserts that Bearer could not be promoted because she was a "Director reporting to a Director," i.e., she reported to Mauk, whose position was also a Director-level. (Doc. 52-2 at 13.) Teva further explained that "[b]ecause Larry Downey did not want to promote Mauk . . . to a Senior Director-level position during the time that [Bearer] reported to Mauk, that blocked [her] from being elevated to a Senior-Director level title as long as [she] reported to Mauk." (*Id.*) Teva maintains that "Keefe would explain this to [Bearer] whenever she

---

applicants from those with plaintiff's qualifications," *Grdinich v. Philadelphia Hous. Auth.*, 2017 WL 2152175, at *7 (E.D. Pa. May 17, 2017) (citing *Bray v. Marriot Hotels*, 110 F.3d 986, 989–90 (3d Cir. 1997)), she can *alternatively* establish the inference by "show[ing] that similarly situated individuals outside the plaintiff's class were treated more favorably." *Grassmyer v. Shred-It USA*, Inc., 392 F. App'x 18, 27 (3d Cir. 2010) (citation omitted). Here, Bearer has pointed to at least one male employee, Marty Berndt, who was given the sort of "progressive promotion within [his] role" that Bearer argues she should have been given. (Doc. 62 at 20.) Further, she has identified several other male employees, including Mauk, Foote, and Keefe, who were selected for promotions for which they did not specifically apply and were not posted to Teva's job board. (*Id.*) We find that this evidence, coupled with her general evidence of a "glass ceiling" and a "boys' club," *see supra* Section I.B., is sufficient to allow a reasonable jury to conclude, at the prima facie step of the *McDonnell Douglas* analysis, that the circumstances could give rise to an inference of discrimination.

would ask why she could not receive a boost to her current title (*i.e.*, to become a Senior Director)." (*Id.*) Accordingly, Teva has satisfied its burden to put forth a legitimate nondiscriminatory reason, and the burden shifts back to Bearer to point to evidence of pretext.

### iii.    Pretext

At this step of the analysis, Bearer has the burden of production "to provide evidence from which a factfinder could reasonably infer that the employer's proffered justification is merely a pretext" for discriminatory or retaliatory animus. *Burton v. Teleflex Inc.*, 707 F.3d 417, 427 (3d Cir. 2013) (citing *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir.1994)). To show pretext, Bearer "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory [or retaliatory] reason was more likely than not a . . . determinative cause of the employer's action." *Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 198–99 (3d Cir. 2015) (quoting *Fuentes*, 32 F.3d at 764). With regard to the first method of showing pretext, the *Fuentes* court explained that:

> To discredit the employer's proffered reason, . . . the plaintiff cannot simply show that the employer's decision was wrong or mistaken since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons.

*Fuentes*, 32 F.3d at 765 (internal citations and quotations omitted). The Third Circuit has also characterized the plaintiff's burden as a requirement to "submit evidence which . . . casts doubt upon the legitimate reasons proffered by the employer such that a fact-finder could reasonably

conclude that the reasons were a fabrication." *Howell v. Millersville Univ. of Pa.*, 749 F. App'x 130, 134 (3d Cir. 2018) (citations and quotations omitted).

Here, Bearer argues that the jury could disbelieve Teva's proffered reason "because it has been undermined by [Teva's] own witness." (Doc. 62 at 28.) Specifically, she points to Downey's deposition testimony in which he acknowledged that "there was nothing preventing a senior director from reporting to a director." (*Id.* (citing Downey Dep. 180:22–181:2.)) He testified as follows:

> Q: So there was nothing preventing a senior director from reporting to a director. That could have been done, right?
>
> A: It could have been done.

*Id.* We find that this testimony sufficiently contradicts Teva's proffered justification—that Bearer's reporting relationship with Mauk prevented her from being promoted to a Senior Director—to allow a reasonable factfinder to disbelieve it. Indeed, Teva originally presented its justification as non-optional adherence to a necessary reporting structure in which a Director who is already reporting to a Director "could not receive a boost to her current title" to become a Senior Director. Downey's admission that adherence to such a reporting structure was in fact merely optional serves to undercut the proffered reason for not promoting Bearer within her then-current role.

Taken together, we find that Bearer has supported a prima facie case of discrimination, and that she has cast sufficient doubt over Teva's proffered justification to enable a jury to conclude that it is pretextual. As such, summary judgment is denied as to Bearer discrimination claim predicated upon her failure to be promoted within her then-current role from Director to Senior Director in the Market Access group.

**b.  Pricing project that did not result in a Senior Director position**

In September 2016, Bearer, in addition to her normal job responsibilities, began working on a global pricing project to "support [Marty] Berndt's Global Health Ecosystems group[15] to help them to develop global pricing." (Doc. 62 at 25.) The project was originally intended to last for three months, but ultimately continued for seven months. (*Id.*) Prior to beginning the project, Bearer had discussed with Simon Brooks, who was her direct supervisor on the project and reported to Berndt, that if she were to join the group in a permanent role, she would only be willing to do so as a Senior Director. (Doc. 62-4 at 156.) After approximately "two to three months" on the project, Brooks informed her that if she wanted to join the pricing group, the "job is yours." *Def. Statement of Undisputed Facts* ¶ 102 (Doc. 62-3); Bearer Dep. 242:7-8. However, Berndt ultimately "came back to [Bearer] and told her that the position was posted as a director, and that he was not able to justify another senior director position." (Doc. 62-3 ¶ 102.) Bearer was offered the Director-level position that had been created, but turned it down because she was only interested in a Senior Director position. (*Id.*) Bearer argues that these facts represent a situation in which "Defendants used [her] skills and abilities in connection with an important project (to which she devoted seven months while continuing to work in her Director job) but failed to reward (or even compensate) her in connection with the same." (Doc. 62 at 26.)

In response, Teva argues that these circumstances do not constitute an adverse action in that the Senior Director position Bearer sought did not exist, and that this allegation therefore

---

[15] There is a discrepancy as to the name of the group where the global pricing project was housed. In Bearer's brief, she refers to a global pricing project within the "Global Health Ecosystems group," while Teva's filings refer to it as the "Global Specialty Pricing Group." While we have noted this discrepancy to alleviate any potential confusion, the name of the group in which Bearer's pricing project was housed is inconsequential. For the purposes of this section, we defer to the name utilized in Bearer's filing.

amounts to a failure to a create a new position, not a failure to promote. Teva further contends that she cannot make out a prima facie showing of discrimination because she cannot establish, and does not argue, that it "ultimately filled the position with someone outside of her protected class or continued to seek applicants from those with plaintiff's qualifications." (Doc. 52-2 at 24.)

At the outset, we acknowledge, as we discussed above, that a failure to create a new position and promote the plaintiff into it generally does not constitute an adverse action. *See Young,* 359 F. App'x at 310. However, the specific circumstances with which we are presented here may not fit neatly within that general rule. That is, in *Young,* the primary Third Circuit opinion on this point, the Court of Appeals explained its reasoning in finding that there was no adverse action as follows: "This position did not exist when Young requested the promotion, and no one at Temple promised her such a position would (or could) be created. Young's subjective expectation that Temple would create an entirely new position for her (and her alone) cannot support a prima facie case of retaliation." *Id.* Further, in *Frintner,* an Eastern District of Pennsylvania case relied upon by Teva for the proposition that failure to create a new position is not an adverse action, the court's reasoning similarly relied on its finding that "the evidence in this case does not support an actual promise to promote [plaintiff] to such a position [that was never created]." *Frintner v. TruePosition,* 892 F. Supp. 2d 699, 710–11 (E.D. Pa. 2012). Rather, the court found that the evidence "demonstrate[d] not more than that [plaintiff's supervisor] wholeheartedly believed that [plaintiff] deserved and needed a promotion and promised to try to get her one, that he proposed a promotion for her, and that someone even drafted a job description for a position that would be a promotion for her." *Id.* at 711. It thus concluded that the case before it was "not meaningfully distinguishable from the scenario addressed by the Third Circuit Court of Appeals in *Young*, in

which the plaintiff's supervisor told the plaintiff that she was qualified for a promotion and promised to 'look into' creating a position to which to promote her." *Id.* at 711.

These cases make clear that, in determining whether there is an adverse action, it is proper to consider whether there was a promise to promote into a yet-to-be-created position or whether the plaintiff merely had a "subjective expectation" that a new position would be created. Here, there is some disagreement as to whether Brooks and Berndt agreed and/or promised Bearer that she could move into the group as a Senior Director, as Bearer seems to assert that the position was promised to her. (See Doc. 62 at 26.) As she describes it in her Statement of Additional Undisputed Facts, "Brooks, after communicating with Berndt about [her stance that she would only move into the group as a Senior Director], agreed that Plaintiff could move into the group at a Senior Director level." (Doc. 62-4 ¶ 156.) This characterization clearly implies that a promise was made by virtue of Brooks and Berndt agreeing that Bearer could have a Senior Director position. However, the deposition testimony that Bearer references in support of this allegation is not so clear cut. Rather, the relevant testimony from Bearer's deposition is as follows:

> Q: Was any commitment made to you before the [global pricing] project began as to what might result as it relates to the project?
>
> A: We discussed – Simon [Brooks] and I, and then I know that he communicated this to Marty [Berndt]. I had a conversation with [Berndt] about the job . . . and, you know, brought him up to speed with what I was doing. And I made it clear that – well, [Brooks] made it clear to me that if I wanted to join his team, I could. This was after two to three months. He said, the job is yours. We had the conversation about the level, and I had told [Brooks] early on I wasn't moving into a lateral role in that group, that the expectation was a senior director, and he agreed. And he communicated that to [Berndt] as well. And I know that for a fact because afterwards, [Berndt] had to come back to me when they posted it as a director and tell me that he wasn't able to justify another senior director position.
>
> Q: So at some point in time . . . you had a conversation with Brooks about the position, and you made it clear that a condition would be that it would have to be a senior director position?

A: Yes.

Q: And did Brooks have the authority to commit to a senior director position?

A: At his current position, no. That was the issue. But, of course, [Berndt] did, and [Berndt] was aware as well.

Q: Did [Berndt] ever commit to you that it would be your job for the taking and it would be at a senior director level?

A: He never said it was going to be my job for the taking. We had the conversation about if I were to move into that role, it would be as a senior director. So he was aware.

Bearer Dep. 241:19–243:23.

We find that this deposition testimony, even taken in the light most favorable to Bearer, does not support that there was any promise of a promotion, but rather that she had merely a "subjective expectation" that the position would be created, which, under *Young*, is not an adverse action. Indeed, while there is potentially a material factual dispute as to whether Brooks agreed that she could move into the group in a Senior Director position,[16] Bearer was aware that he did not "have the authority to commit a senior director position." Further, Bearer expressly testified that the person who *did* have the authority to commit to creating a Senior Director position, Marty Berndt, never made any such commitment. She testified that Berndt "never said it was going to my job for the taking. We had the conversation about *if I were to move into that role*, it *would be* as a senior director. So he was aware." Bearer Dep. 243:19–23 (emphasis added). This testimony

---

[16] We note that the evidence does not support that Brooks made any such commitment to her. Indeed, Bearer testified that she and Brooks "had the conversation about the level, and I had told [Brooks] early on I wasn't moving into a lateral role in that group, *that the expectation* was a senior director, *and he agreed*." Bearer Dep. 242:9–13 (emphasis added). This testimony only definitively demonstrates that Brooks agreed that, if Bearer were to move into the group, her *expectation* was that it would be as a senior director. That is a markedly different agreement than actually committing to her that a senior director position would be created for her. However, this distinction is ultimately inconsequential to our resolution of this claim.

demonstrates only that Bearer and Berndt discussed that under a *hypothetical* scenario in which Bearer were to join his group (*i.e.*, "*if I were* to move into that role"), she would only be willing to do so as a Senior Director (*i.e.*, "it *would be* as a senior director").

Accordingly, we conclude that principles set out in *Young* and related cases weigh in favor of a finding that no adverse action occurred here. *See Young,* 359 F. App'x at 310 ("[Plaintiff's] subjective expectation that [Defendant] would create an entirely new position for her (and her alone) cannot support a prima facie case of retaliation."); *see, e.g.*, *Frintner*, 892 F. Supp. 2d at 710–11 (finding no adverse action where plaintiff's supervisor "wholeheartedly believed that Ms. Frintner deserved and needed a promotion and promised to try to get her one, that he proposed a promotion for her, and that someone even drafted a job description for a position that would be a promotion for her.")[17]; *Stoppi v. Wal-Mart Transp.*, LLC, 2010 WL 3398990, at *9 (M.D. Pa. Aug. 26, 2010) ("Defendant did not promote anyone, and thus did not make an adverse employment decision.").

Further, even if these circumstances could be said to constitute an adverse action, Bearer cannot establish, and in fact does not even argue, that they support an inference of discriminatory animus under the "pretext" step of our analysis.[18] To establish an inference of discriminatory animus in the context of a failure to promote claim, a plaintiff must typically show that the defendant filled the position from which she was rejected "with someone outside of the protected class or continued to seek applicants from those with plaintiff's qualifications." *Grdinich v.*

---

[17] We observe that the circumstances before us do not come as close to a "promise" to create a new position, or establishing a reasonable expectation thereof, as did the circumstances in *Frintner*, wherein the court found that no adverse action had occurred.

[18] We also note that she has not argued that these events are causally connected to any protected activity, as required to support a retaliation claim, and no such connection is apparent to us in the record.

*Philadelphia Hous. Auth.*, 2017 WL 2152175, at *7 (E.D. Pa. May 17, 2017) (citing *Bray v. Marriot Hotels*, 110 F.3d 986, 989–90 (3d Cir. 1997)). Here, Teva never filled the position of Senior Director, and it never sought any applications for it; the position was simply never created. Further, the director-level position that was created was offered to Bearer, and she turned it down. Moreover, Bearer expressly testified that she does not believe that the decision to post the pricing position as a director-level position rather than a senior director was based upon age or gender. Bearer Dep. 248:14–20. Nor has she pointed to any evidence that it was causally connected to any protected activity in which she may have engaged. Viewing these facts in the light most favorable to Bearer, it is clear that, even if she could establish an adverse action, she could not meet her burden to show circumstances giving rise to an inference of discrimination or retaliation. For the reasons set out above, summary judgment is granted for Teva as to this claim.

### c.   Removal of Senior Director of Global Payer Marketing position

Bearer's next claim is predicated upon the circumstance in which she learned that a new Senior Director position in Global Payer Marketing had been posted by Aaron Deves and that "a substantially younger male candidate" had been brought in to be interviewed for it. *Am. Compl.* ¶ 64. When she found out about the position, she inquired with George Keefe and Bryan Mauk as to whether they were aware of the posting. Bearer Dep. 284:15–285:9. Keefe and Mauk informed Bearer that they were not aware of the position, but they encouraged her to apply for it. Bearer Dep. 285:7–21.   She then applied. *Id.* ¶ 69. However, several of her superiors were "very upset that [Deves] had taken it upon himself to post the position" and unilaterally bring in a colleague for an interview. Bearer Dep. 286:6–9. Ultimately, in July 2017, before she was interviewed, the posting was removed, and a decision was made not to fill it at all. (Doc. 62-3 ¶ 122.)

At the outset, we observe that Bearer has presented no evidence or argument in support of this claim. Indeed, she does not address it in her opposition brief, nor is it included in her Statement of Additional Undisputed Facts. Rather, the only extent to which she acknowledges this claim for the purposes of the present motion is her responses where Teva has referenced it in its Statement of Undisputed Facts. (*See* Doc. 62-3 ¶ 122–27.) However, Bearer has expressly listed in her opposition brief certain claims upon which she no longer seeks to proceed and has omitted this claim from that list. Accordingly, we assume that she has not abandoned it, despite the fact that she has not sought to support it. In any event, in response to her allegations, Teva argues that these circumstances do not support a prima facie case of discrimination in that there is no adverse action because the position was "withdrawn and never filled," and that there is no inference of discriminatory animus because "[e]ven Plaintiff admits that she does not believe the position was taken down on the basis of age or gender." (Doc. 52-2 at 25.)

Where, as here, a plaintiff applies for a position that is never filled, she is necessarily unable to "satisfy the fourth element that the employer sought to, or did fill the position with a similarly qualified person." *Tsakonas v. Nextel Commc'ns, Inc.*, 2006 WL 2527998, at *6 (D.N.J. Aug. 31, 2006); *see also Lula v. Network Appliance*, 255 F. App'x 610, 612 (3d Cir. 2007) (no prima facie claim where "a potential employee was not hired because the company 'deactivated' that position and did not fill it"). Further, Bearer has not presented any evidence that "similarly situated individuals outside [her] class were treated more favorably" in similar circumstances, "as an alternative to the original fourth prong of the prima facie case." *Grassmyer*, 392 Fed. App'x at 27. Finally, Bearer has not argued or pointed to any evidence that Teva's removal of the position was causally connected to any protected activity in which she engaged, and no such connection is apparent to us. Bearer's claim related to the removal of a posted position that was never filled

therefore cannot support a prima facie case of discrimination or retaliation, and summary judgment for Teva is proper.

### d. Foote's promotion to director following Mauk's departure

Bearer's next claim relates to a vacancy that was created when her direct supervisor, Bryan Mauk, who, despite being her supervisor was also in a Director-level position, was promoted to Chief of Staff.  (Doc. 62-4 ¶ 160.) Following Mauk's promotion, Bearer expressed to her new supervisor, Jon Miller, that she was interested in assuming the position vacated by Mauk because "her understanding was . . . that she would have been promoted to Senior Director if she were given that role." (Doc. 62-3 ¶ 139.) However, a position specifically to fill the one vacated by Mauk was never created. (*Id.*) Instead, Adam Foote was promoted to a Director-level position within the same group as Bearer, and he and Bearer "split" the duties associated with Mauk's role. (Doc. 62-4 ¶ 161; Doc. 62-3 ¶ 140; Bearer Dep. 415:20–416:2.) While he did not become Bearer's supervisor and was what Teva characterizes as a "co-head" of the group along with Bearer, she nonetheless maintains that there was an appearance or an "assumption" that Foote was her superior, as Foote had been assigned more direct reports within the group than she had. (Doc. 62-3 ¶ 142–43.)

Based on these events, Bearer asserts that she should have been promoted into the role vacated by Mauk and that that role should have become a Senior Director position. That is, she makes clear that "[s]he is not alleging that should have been promoted into the Director-level position into which Defendants promoted Foote. She is asserting that, if Defendants had any interest in advancing the career of a woman, they would have made the position a Senior Director-level position to which she would have applied." (Doc. 62 at 24.) She further alleges that, "setting aside Defendants' failure to [make her a Senior Director to fill Mauk's vacancy], Teva "treated the

female (Plaintiff) worse than the male (Foote) by assigning significant responsibility and twice the number of direct reports that Plaintiff had while not giving Plaintiff any additional responsibilities, or direct reports, that would allow her to expand her role and help her develop and advance within the company." (*Id.*) She argues that while Foote was given more responsibility in conjunction with his promotion, her "job did not change at all." (Doc. 62-3 ¶ 142.) As she succinctly states it in her response to Teva's statement of facts, Bearer "asserts that Mauk's job was split, Foote promoted, and additional responsibilities and direct reports assigned to him because of Plaintiff's sex, age, and/or complaints of discrimination." These allegations do not constitute an adverse action.

At the outset, we observe that Bearer's argument that she should have had the opportunity not only to apply for the position vacated by Mauk, but further that it should have first been reclassified as a Senior Director-level position, is unavailing. The only justification Bearer puts forth as to why this position could have been a Senior Director-level position is that Mauk's predecessor, Zabroske, had held it while at the Senior Director level. We are not persuaded. The Senior Director position that Bearer desired simply did not exist. Indeed, in her response to Teva's statement of facts, Bearer acknowledges that promoting her into such a position would have required Teva to first "create" the position. (Doc. 62-3 ¶ 139 (alleging that "the position *was not created* due to . . . her sex, age, and/or complaints of discrimination") (emphasis added)).  Further, Bearer does not allege that anyone at Teva gave her any indication that such a position could or would be created. She had nothing more than an unsupported, subjective expectation of such a position. As we have already discussed at length, failure to create a new position does not constitute an adverse action in the context of either discrimination or retaliation.[19] *See Young,* 359 F. App'x

---

[19] We find this scenario to differ importantly from the one in which Bearer did not receive a progressive promotion within her then-current role, which we discussed above. There, we found that the Third Circuit's ruling in *Young* did not direct a finding of no adverse action, as Bearer had

at 310; *see also Hunter*, 2021 WL 1424710, at *6 (no adverse action where the position plaintiff desired "was never created and filled as anticipated," and "[i]nstead, Defendant spread the duties across a larger team."); *see also Stoppi*, 2010 WL 3398990, at *9 ("Defendant did not promote anyone, and thus did not make an adverse employment decision.").

Further, Bearer's argument that, following his promotion, Teva "treated" Foote better than her "by assigning [him] significant responsibility and twice the number of direct reports," while her "job did not change at all," does not constitute an adverse action for the purposes of a discrimination claim. (Doc. 62 at 24.) In assessing whether this was an adverse action, we reiterate that an adverse action is one that is "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 326 (3d Cir. 2015). Here, because Bearer's job admittedly "did not change at all," neither did the "compensation, terms, conditions, or privileges" of her job. Indeed, while Bearer points out that Foote was assigned more direct reports than her, the number of direct reports to which she was assigned was not reduced whatsoever. Nor was her compensation, or any other benefit of her employment, diminished. Further, with Foote's promotion, she remained in her role as the head of "AJOVY launch team,"[20] which she testified was a "visible" and "high profile" position. Bearer Dep. 147:20–24.

---

not necessarily sought to have Teva "create a new position' for her. Rather, her request was that she be given more responsibility within her then-current role, so that the gradation of that position could be increased to a Senior Director level. Here, by contrast, Bearer requested the opportunity to apply for an entirely different position that did not exist. Further, it is significant here that Bearer admitted that a new position would have to have been "created" for her to be promoted into it. (Doc. 62-3 ¶ 139.)

[20] Ajovy was a new Teva product, "a migraine product," that Teva was then preparing to take to market. The lauch of Ajovy occurred in 2018. (Doc. 62-3 ¶ 69.)

The only negative effect that Bearer argues resulted from her being given less responsibility and direct reports than Foote is that without receiving "any additional responsibilities, or direct reports, [she would have less opportunity] to expand her role and help her develop and advance within the company." (Doc. 62 at 24.) While we acknowledge that there are circumstances where placing one employee in a position to increase opportunity for career advancement relative to plaintiff may constitute an adverse action, *see Remp v. Alcon Lab'ys, Inc.*, 701 F. App'x 103, 107 (3d Cir. 2017), such circumstances are simply not before us. Indeed, she has not shown that Foote's position was "objectively better (*e.g.*, more prestigious or less burdensome)" than hers, as opposed to merely "different" from hers. *See Swain v. City of Vineland*, 457 F. App'x 107, 110 (3d Cir. 2012). While she asserts that Foote's assignment of more responsibility and direct reports would have created more opportunities for advancement, she has not pointed to any evidence to illustrate that that is anything more than a subjective belief. Indeed, Bearer has not described any of the "significant responsibilities" that Foote had but she did not. Further, while she highlights that Foote had "twice the number of direct reports," she also testified that his total number of direct reports was "four – I don't know – maybe five," whereas she had two. Bearer Dep. 419:20–420:1. Notwithstanding this small gap between their number of direct reports, Bearer has also not demonstrated that the number of direct reports she was assigned impacted her career advancement opportunities. Indeed, she was in a "visible" and "high profile" role. She has not shown that her desire for more direct reports was more than a "subjective preference . . . which is insufficient to establish an adverse employment action."[21] *Swain*, 457 F. App'x at 110.

---

[21] Further, as we discuss below, even if Bearer could be said to have supported a prima facie discrimination claim on this basis, she has not successfully refuted Teva's proffered justification by demonstrating that it is pretextual.

Additionally, we conclude that her allegations of preferential treatment for Foote cannot sustain her retaliation claim. We acknowledge that under the "broader" definition of an adverse action in the retaliation context, the assignment of more responsibilities and direct reports to Foote could potentially be considered "materially adverse." However, we need not reach a determination on that question, as its resolution is ultimately inconsequential. Indeed, even if she is able to demonstrate a prima facie retaliation claim,[22] Teva has articulated a legitimate non-discriminatory reason for assigning Foote more responsibility than her, and she has failed to point to any evidence that this reason is pretextual. That is, Teva argues that its assignment of more responsibilities to Foote was actually beneficial to Bearer, in that it enabled her to "maintain her focus and fulfill her role within the critically important Ajovy launch project," instead of "saddling [her] with more work without the benefit of a boost in job title or compensation." (Doc. 52-2 at 40.)

Teva having proffered a legitimate justification for its action, the burden shifts to Bearer "to provide evidence from which a factfinder could reasonably infer that the employer's proffered justification is merely a pretext" for discriminatory or retaliatory animus. *Burton v. Teleflex Inc.*, 707 F.3d 417, 427 (3d Cir. 2013) (citing *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir.1994)). To show pretext, Bearer "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or

---

[22] While the first prong of a prima facie retaliation claim—that she engage in a protected activity—is undoubtedly satisfied by the fact that she filed her first EEOC and PHRC charge on December 11, 2017, it is not clear that Bearer has satisfied the third prong—illustrating a causal connection between the protected activity and the adverse action. In fact, Bearer has not presented any argument in her brief as to the causal element of the prima facie case. While we acknowledge that the temporal proximity of the action to the protected activity here is highly suggestive, Bearer has not argued that it is "unusually suggestive" so as to establish the causal connection, nor has she pointed to other indicia of a connection to buttress the temporal proximity. Ultimately, however, we need not determine whether she has supported a prima facie case, as even proceeding under the assumption that she has, we conclude that her retaliation claim fails, as our discussion below demonstrates.

(2) believe that an invidious discriminatory [or retaliatory] reason was more likely than not a . . . determinative cause of the employer's action." *Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 198–99 (3d Cir. 2015) (quoting *Fuentes*, 32 F.3d at 764). "The plaintiff must not only establish that the employer's reason was wrong, but that it was so plainly wrong that it could not have been the real reason." *Keller v. Orix Credit All., Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997).

Bearer has not met this burden. In fact, she has not pointed to *any* evidence of pretext. (Doc. 62 at 30.) Her only response to Teva's proffered reason was to state that she subjectively "viewed those actions not as a favor, but, rather, as discriminatory, as [they were] further evidence of Defendants' . . . failing to advance the career of the female employee." (Doc. 62 at 30.) This assertion provides no basis to disbelieve Teva's articulated justifications, nor to believe that an invidious retaliatory reason was more likely than not a determinative cause of Teva's action. Further, the fact that Bearer was ultimately promoted to Senior Director in January 2019, four months after the Ajovy launch in September 2018, supports Teva's explanation that she was not given increased responsibilities in January 2018 so that she could stay focused exclusively on the Ajovy launch. Accordingly, summary judgment on her retaliation claim is proper.[23] *See Wiest v. Tyco Elecs. Corp.*, 812 F.3d 319, 332 (3d Cir. 2016) (quoting *Moticka v. Weck Closure Sys.*, 183 Fed.Appx. 343, 353 (4th Cir. 2006) (noting that when an employee receives favorable treatment after the alleged protected activity, "the inference of retaliatory motive is undercut").

---

[23] As we noted above, *see supra* Note 17, Teva's proffered legitimate nondiscriminatory reason and Bearer's failure to refute it would also undermine Bearer's discrimination claim had we determined that Teva's conduct constituted an adverse action.

### e.   Nonreceipt of President's Club Award

Bearer's next claim relates to her nonreceipt of Teva's 2018 President's Club Award. We first provide relevant background information regarding the Award. Then we discuss Bearer's claim.

Bearer described the President's Club Award as "very prestigious," and stated that the "winners receive a trip with a partner, a crystal bowl, and a cash award of about $5,000." (Doc. 62-4 ¶ 207.) George Keefe, Vice President of Market Access and the head of the committee that oversaw selection of the award, testified that receiving the honor was "a lofty and rare distinction." (Doc. 52-11 ¶ 11.) Specifically, according to Teva's published "U.S. Market Access P-Club Selection Process and Criteria" document, the 2018 Award "recognize[d] outstanding individual achievement and impact during [fiscal year] 2017." (Doc. 52-22 at 1.) Examples of "individual accomplishments" included "Results/BP execution, Leadership, Recruiting/Retention, Employee development, [and] Project management." (*Id.*) The basic criteria for selection included: "Good standing within Teva, Practice the Teva values, Demonstrated proficiency in position, Significant individual and/or team accomplishments in year of nomination, Demonstrated teamwork and communication with peers, field, and internal teams, Demonstrated leadership within function and applicable internal teams, 90%+ Achievement of 2017 goals." (*Id.* at 2.) In applying these criteria, the document notes that,

> Because this award is not solely based upon quantitative parameters and metrics (*i.e.*, IMS market share) it is by nature, a more subjective award than the sales awards. Therefore, please recognize:
> - Consistent high performance through 2017 will be weighed with 2017 accomplishments.
> - Leadership and teamwork will be a significant factor.
> - It is <u>not</u> a perfect science and final selections are always very difficult.

(*Id.* at 4 (emphasis in original)).

Selection of award recipients is determined by a committee that is made up of the Market Access group leadership and headed by Mr. Keefe. Keefe Dep. 286:8–15. This committee "evaluate[s] everybody's performance every year for the President's Club." Keefe Dep. 286:3–4. In addition to this review of "everybody's performance," there is a "peer nomination process" whereby employees of the Market Access group can nominate any of their colleagues for the Award. Keefe Dep. 286:24–287:4; (Doc. 52-22 at 3). Each employee may also complete a nomination form on his or her own behalf. (Doc. 52-22 at 3.) However, the nomination process is "not a vote" and merely "alerts [the committee] to people who could be considered for an award." Keefe testified that "most people in the [Market Access] group meet the basic criteria for the award," but that, "that doesn't mean they are necessarily going to be selected for the award." Keefe Dep. 288:4–8. Rather, he stated that "[i]t's somewhat of a subjective award" that is based on "performance in that given year" and "leadership." Keefe Dep. 286:20–24.

Nominations for the 2018 Award were due on December 15, 2017, and Awards were issued in February 2018. (Doc. 52-22.) Bearer was not selected for an Award, and to her knowledge, she had not been nominated. Bearer Dep. 408:21–409:2. Instead, Travis Kenney and Dave Miley, Market Access employees who are both male and younger than Bearer, were selected. (Doc. 52-11 ¶ 13–14.) Bearer argues that she should have been selected for the Award because of her "accomplishments, her performance (including, but not limited to, her 'Outstanding' performance review), and her critical contributions to Defendants' new flagship product[, Ajovy]." (Doc. 62 at 27.) We now turn to assess Bearer's discrimination claim and determine that it withstands the summary judgment motion.

i.         **Adverse Action**

The Third Circuit has not specifically addressed whether failing to be selected for an award similar to the President's Club Award constitutes an adverse action "that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Jones*, 796 F.3d at 326. At the outset, we observe that failure to receive a performance award that is *nonmonetary* and does not otherwise confer tangible employment benefits is *not* an adverse event. *See, e.g.*, *Johnson v. Indep. Blue Cross*, 2013 WL 1874954, at *13 (E.D. Pa. May 3, 2013) (holding that "management's failure to nominate Johnson for a Best of the Best award . . . did not deny him 'serious and tangible' workplace benefits" where the "award recipient received lunch with the company president, a plaque, and a booklet outlining his or her accomplishments" but did not receive "a monetary bonus, a raise, a promotion, new assignments, or eligibility for any of these things at a later date"). However, neither our Court of Appeals nor any district courts within the Third Circuit have addressed the precise question of whether the failure to select an employee for an award like Teva's President's Club Award, which is "very prestigious" and came with a *monetary* bonus, is an adverse action. Still, in support of its contention that it is not an adverse event, Teva discusses *Douglas v. Donovan*, 559 F.3d 549 (D.C. Cir. 2009), where the D.C. Circuit Court of Appeals addressed a similar scenario.

In *Douglas*, the plaintiff, an employee of the Department of Housing and Urban Development, argued that "he was discriminated against when his department head failed to recommend him for a highly coveted award," the Presidential Rank Award. *Id.* at 551. The Presidential Rank Award "is the highest recognition given to federal 'senior executives,'" and "[t]he number of awards given annually is tightly restricted, and the financial benefits are

substantial." *Id.* In ruling that failure to be recommended this award, the D.C. Circuit explained that:

> The Presidential Rank Award recognizes extraordinary performance. It is not earned in the ordinary course of employment for adequate or even superior work or for meeting or exceeding established goals. Instead, it is intended to reward outstanding leadership and innovation—indefinable star qualities that are by their very nature subjective. Failure to make the cut for such an award cannot be deemed a significant change in responsibilities; nor would elimination from the competition affect employment opportunities in an objectively tangible way. Therefore, unlike failure to be promoted, failure to be recommended for a Presidential Rank Award is not categorically an adverse employment action.

*Id.* at 553. In addition to that reasoning, the court explained that the failure to recommend Douglas for the Award was not an adverse action because "a recommendation for a Presidential Rank Award does not automatically or even consistently lead to receipt of one." *Id.* at 553–54. That is, the court stated that:

> Because of the many moving parts involved in selecting a Presidential Rank Award winner—including multiple rounds of independent evaluation both inside and outside of HUD, with a final decision by the President—even if [Douglas's supervisor] had recommended [him], it is quite uncertain whether the President ultimately would have selected Douglas to receive an Award, rendering any harm from the failure to recommend "speculative" and "difficult to remedy."

*Id.* at 553.

Based on the factual similarities between the scenario before us and the one before the D.C. Circuit, Teva urges us to apply the rule from *Douglas*.[24] However, further review of relevant D.C. Circuit opinions suggests that its holding is more accurately viewed somewhat narrowly. *See Bridgeforth v. Jewell*, 721 F.3d 661, 665 (D.C. Cir. 2013) (explaining that *Douglas* does not set out a "categorical rule that an employer's failure to nominate an employee for [an award] could

---

[24] Bearer does not address this argument in her brief other than to note that *Douglas* is not a Third Circuit case.

never be unlawful" and admonishing that "context matters").[25] Accordingly, we understand the *Douglas* court's conclusion to have been predicated on two findings: First, that the Presidential Rank Award is "not earned in the ordinary course of employment" but rather is based on "indefinable star qualities that are by their very nature subjective;" and second, that "any harm from the failure to recommend" was too "speculative" to constitute an adverse action, "[b]ecause a recommendation for a Presidential Rank Award does not automatically or even consistently lead to receipt of one." *Douglas*, 559 F.3d at 553–54.

Further, in *Bridgeforth*, an opinion subsequent to *Douglas*, the D.C. Circuit confirmed the significance of these factors. *Bridgeforth*, 721 F.3d at 664. There, the court declined to find an adverse action for failure to nominate for an award that would have resulted in additional time off from work. *Id.* at 665. The court reasoned that there was no adverse action in that the award was based on "highly subjective standards," and the plaintiff failed to "establish a direct and non-speculative connection between action, nomination, and award," as the path to an award was "a labyrinth" that required approval from a supervisor, a captain, and possibly the Chief of Police. *Id.* at 664. In doing so, the court differentiated that scenario from one where an employee's low score on a performance evaluation that resulted in not receiving a cash award was an adverse action, because "[t]he link between performance evaluation and award was so direct that the alleged harm was not speculative." *Id.*

On the one hand, there are certain undeniable similarities between Teva's President's Club Award and the awards at issue in *Douglas* and *Bridgeforth*. Namely, the President's Club Award

---

[25] Indeed, in a subsequent D.C. District Court opinion that referenced *Douglas*, the court stated that, "[a]lthough denials of monetary performance awards or bonuses typically meet the adverse action standard, denials of non-monetary awards—standing alone—do not." *Thompson v. Sessions*, 278 F. Supp. 3d 227, 247 (D.D.C. 2017) (citations omitted).

is "very prestigious," and it is based on subjective criteria and not earned in the ordinary course of employment. On the other hand, we observe that *Douglas* and *Bridgeforth* are best understood as the exception, and not the rule, as it relates to whether failure to receive a monetary performance award is an adverse action. *See Thompson v. Sessions*, 278 F. Supp. 3d 227, 247 (D.D.C. 2017) (citing *Bridgeforth* for the proposition that, "[a]lthough denials of monetary performance awards or bonuses typically meet the adverse action standard, denials of non-monetary awards—standing alone—do not"). Indeed, Bearer's nonreceipt of the President's Club Award is also analogous to a failure to receive a discretionary monetary bonus based upon a subpar performance evaluation. On this topic, the Third Circuit has endorsed the D.C. Circuit's holding in *Russell v. Principi*, 257 F.3d 815, 819 (D.C. Cir. 2001) that "an employee's negative employment evaluation which resulted in the denial of a purely discretionary bonus constituted an adverse employment action." *See Sala v. Hawk*, 481 F. App'x 729, 732 (3d Cir. 2012) (citing *Russell*, 257 F.3d at 819). Moreover, district courts within the Third Circuit consistently hold that negative performance evaluations can be adverse actions where they "have some tangible effect upon the recipient's employment." *See, e.g.*, *Goode v. Camden City Sch. Dist.*, 2019 WL 6243156, at *16 (D.N.J. Nov. 22, 2019); *Boandle v. Geithner*, 752 F.Supp.2d 540, 565 (E.D. Pa. 2010). Accordingly, the operative question is whether Bearer's nonreceipt of the President's Club Award falls within the general rule that "denials of monetary performance awards or bonuses typically meet the adverse action standard," or within the exception for extraordinary and subjective awards as in *Douglas* and *Bridgeforth*.

In answering this question, we measure the President's Club Award against the two factors applied in *Douglas* and *Bridgeforth*. With regard to the first factor, we reiterate that the selection criteria for the President's Club Award are subjective. Like the criteria in *Douglas* and *Bridgeforth*,

it is largely based on "indefinable star qualities" such as leadership, teamwork, and adherence to "Teva values." Indeed, Teva's internal description of the Award expressly states that the selection process "is *not* a perfect science." (Doc. 52-22 (emphasis added)). Although we accept that the President's Club Award is "not earned in the ordinary course of employment," it is also unclear whether it is as "extraordinary" as, say, the Presidential Rank Award in *Douglas*. That is, the Presidential Rank Award is issued to no more than five percent of eligible federal government executives, and winner are ultimately selected by the President of the United States. Here, while we acknowledge that Keefe described Teva's President's Club Award as "a lofty and rare distinction," this subjective characterization of its exclusivity it unhelpful where we have not been provided with information as to maximum number of annual recipients, or to the number of eligible Teva employees. Still, we find that consideration of this first factor places the President's Club Award slightly closer to the *Douglas*/*Bridgeforth* end of the spectrum.

Nonetheless, our consideration of the second factor confirms that Teva's President's Club Award ultimately does not fall within the *Douglas*/*Bridgeforth* exception. As discussed above, this factor contemplates the degree to which ultimate receipt of the award was speculative and whether is a "direct tie" between the alleged adverse action and tangible harm. That is, in both *Douglas* and *Bridgeforth*, the D.C. Circuit's reasoning relied heavily on its determination that the process for receiving an award was "labyrinthine." In *Douglas*, the court described the process as follows:

> An eligible executive must be recommended by his agency; within HUD, department heads recommend employees to HUD's Performance Review Board ("PRB"), which evaluates the candidates and then forwards a slate of prospective nominations to HUD's Deputy Secretary and Secretary, who—at least formally— decide which candidates will be recommended to the Office of Personnel Management ("OPM"). OPM "review[s] such recommendations and provide[s] to the President recommendations as to which of the agency recommended appointees should receive such rank." The President of the United States makes the final call.

*Douglas*, 559 F.3d at 551. Similarly, in *Bridgeforth*, the selection process included being "passed upon by a supervisor, reviewed by a captain, and, depending on the amount of time-off at issue, approved by the Chief of Police." *Bridgeforth*, 721 F.3d at 664.

By contrast, there is no such labyrinth involved in the selection of Teva's President's Club Award winners. Rather, Keefe testified that he headed a committee made up of the Market Access leadership team that evaluated performance and selected Award winners. There were not multiple levels of review, nor is it even clear whether the committee met more than once to discuss evaluations. Further, while nominations were accepted, they were not required to be considered for an award. Employees were automatically considered for the Award, and the selection process consisted only of a meeting (or meetings) of Keefe's committee at some point within a two-month window between when nominations were due and winners were announced. Moreover, Keefe confirmed that the Award committee did in fact consider Bearer for the Award. Therefore, unlike the circumstances in *Douglas* or *Bridgeforth*, there was no selection process remaining for Bearer to navigate. Instead, her non-selection by the committee had a "direct, measurable, and immediate effect" on Bearer's compensation. *Russell*, 257 F.3d at 819. That is, it directly resulted in her denial of the $5,000 monetary bonus that accompanies the Award.

On the balance of these two factors, we find that Bearer's nonreceipt of the President's Club Award is most accurately viewed as the denial of a performance-based discretionary bonus, which can constitute an adverse action. It does so in the circumstances before us in that it directly deprived Bearer of a $5,000 bonus, and "a bonus is a tangible, quantifiable award." *Russell*, 257 F.3d at 819; *see also Sala*, 481 F. App'x at 732 (favorably citing *Russell* for the proposition that "denial of a purely discretionary bonus constituted an adverse employment action"). As such, her non-selection of the Award resulted in "direct economic harm," which the Third Circuit has

instructed is "an important indicator of a tangible adverse employment action." *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 153 (3d Cir. 1999). Accordingly, viewing the evidence in the light most favorable to Bearer, we conclude that there is at least a genuine dispute of material fact as to whether she has suffered an adverse action in her nonreceipt of the President's Club Award. As such, she has demonstrated prima facie discrimination and retaliation claims for the purposes of summary judgment,[26] and we now turn to assess the next *McDonnell Douglas* prongs—whether Teva has articulated a legitimate non-discriminatory reason, and whether Bearer has pointed to evidence that it is pretextual.

### ii.        Legitimate Nondiscriminatory Reason

At the next step of the *McDonnell Douglas* analysis, the burden shifts to Teva to articulate a legitimate nondiscriminatory reason for its failure to select Bearer for the President's Club Award. On this point, Teva asserts that the fact that Bearer satisfied the basic award criteria and received an "outstanding" performance review did not necessarily mean she was the strongest candidate for the award. Indeed, as Teva points out, Bearer acknowledged in her deposition that, while receiving an "outstanding" is helpful for receiving the Award, "[i]t's not a slam dunk. There are people who get outstandings that don't [receive the President's Club Award]." (Doc. 52-2 at 36 (citing Bearer Dep. 422:17–23)). Further, Teva maintains that the employees who were selected for the 2018 Award, Travis Kenney and Dave Miley, were more deserving than Bearer because of

---

[26] For the same reasons that we have determined her nonreceipt of the President's Club Award is an adverse action in the discrimination context, we find that it is also meets the "broader" standard for an adverse action in the retaliation context. Teva has not disputed whether the other prongs of the prima facie retaliation claim are satisfied, and our review of the record finds that they are. There is no dispute as to whether the other prongs of the prima facie discrimination case are satisfied regarding her nonreceipt of the President's Club Award, and our review finds that they are.

their accomplishments related to, respectively, the launch of a new product and the innovation of an in-market product. (Doc. 52-2 at 36.) That is, Teva explained that:

> [R]ather than being based on just an employee's activities, like hard work that might be reflected in an outstanding performance review, being nominated for and receiving a President's Club Award at Teva requires tangible business results that can be directly tied to the employee's efforts within the organization, like the successful launch of a new Teva product and the innovation upon or advancement of an in-market Teva product.

(*Id.*) (citing Keefe Decl. ¶ 14 (Doc. 52-11)).

On this basis, Teva argues that Kenney was selected for the Award "because, among other things, he played a key role in supporting the successful launch of Austedo[, a new Teva product] . . . during the 2017 fiscal year." (*Id.*) Further, "Miley won because, among other things, he placed a key role in supporting the innovation upon and advancement of GRANIX, an in-market Teva product, . . . by helping obtain preferred coverage among commercial insurance providers, federal governmental accounts, and state Medicaid programs, during the 2017 fiscal year." (*Id.*) Teva contends that these accomplishments made Kenney and Miley more deserving than Bearer because, "by contrast, [she] did not play a key role in supporting the launch of Austedo, or any other new Teva product, during the 2017 fiscal year; nor did she support the innovation upon and advancement of GRANIX, or any other in-market product, during the 2017 fiscal year." (*Id.*) Keefe offered additional insight into the committee's decisionmaking at his deposition. He explained that:

> [Bearer's] work while certainly very . . . valuable that year [2017], was for a product that had not been launched yet [i.e. Ajovy]. [That] was going to be launched in September of [2018]. So as I recall, the [committee's] thinking was that she would certainly be under strong consideration for the following year, but we had two other people that better met the criteria for that year.

Keefe Dep. 288:22–289:7.[27] Accordingly, Teva has satisfied its burden to put forth a legitimate nondiscriminatory reason, and the burden shifts back to Bearer to point to evidence of pretext.

### iii.      Pretext

At this step of the analysis, Bearer has the burden of production "to provide evidence from which a factfinder could reasonably infer that the employer's proffered justification is merely a pretext" for discriminatory or retaliatory animus. *Burton v. Teleflex Inc.*, 707 F.3d 417, 427 (3d Cir. 2013) (citing *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir.1994)). To show pretext, Bearer "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory [or retaliatory] reason was more likely than not a . . . determinative cause of the employer's action." *Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 198–99 (3d Cir. 2015) (quoting *Fuentes*, 32 F.3d at 764). With regard to the first method of showing pretext, the *Fuentes* court explained that:

> To discredit the employer's proffered reason, . . . the plaintiff cannot simply show that the employer's decision was wrong or mistaken since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons.

*Fuentes*, 32 F.3d at 765 (internal citations and quotations omitted). The Third Circuit has also characterized the plaintiff's burden as a requirement to "submit evidence which . . . casts doubt upon the legitimate reasons proffered by the employer such that a fact-finder could reasonably

---

[27] Despite Keefe's insistence that Bearer was in a better position to receive the President's Club Award in 2019, she ultimately was not selected for the award the following year, either. (Doc. 62 at 32.)

conclude that the reasons were a fabrication." *Howell v. Millersville Univ. of Pa.*, 749 F. App'x 130, 134 (3d Cir. 2018) (citations and quotations omitted). Bearer puts forth several arguments as to why Teva's articulated justifications are pretextual.

First, she argues that Teva's "assertions regarding decisions about the President's Club Award are inconsistent." (Doc. 62 at 30.) Specifically, she points out that in its response to an interrogatory, Teva stated that Mauk was the primary decisionmaker who selected 2018 Award winners and explained that he "selected two individuals whose performances during the year warranted their nomination." (Doc. 62-4 ¶ 220.) At his deposition, however, Mauk testified that he did not nominate anyone for the 2018 Award, as opposed to previous years, because he "was in a different role at that time." Mauk Dep. 77:5–78:24. Further, Bearer points out that in his deposition, when asked whether he had "any explanation . . . as to why [Bearer] wasn't selected for the President's Club Award," Keefe testified that the reason was because Travis Kenney and Adam Foote had superior performance in 2017. Keefe Dep. 288:12–17. He went on to discuss that Foote was selected due to his involvement "in [Teva's] strategy with Copaxone," which was "already. . .on the market," as opposed to Bearer's work on Ajovy, which "had not been launched yet." Keefe Dep. 288:19–289:2. As Bearer highlights, however, in Keefe's Declaration and throughout Teva's briefing, it maintains that Dave Miley, not Adam Foote, was selected for the President's Club Award instead of Bearer.

Next, Bearer argues that the use of subjective criteria in making selections for the President's Club Award shows that the decision not to award her was pretextual. As Bearer references, we acknowledge Third Circuit opinions explaining that "low evaluation scores may be a pretext for discrimination, especially where . . . an employer uses subjective criteria such as 'attitude' and 'teamwork' to rate its employees." *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d

Cir. 2006). We further observe that "subjective evaluations are more susceptible of abuse and more

likely to mask pretext." *Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 320 (3d Cir. 2000)

(citation and quotations omitted). Further, Bearer contends that the absence of "documentation as

to why Defendants failed to give [her] the President's Club Award" is evidence of pretext. (Doc.

62 at 31.) Additionally, she argues that Keefe's explanation that she was not selected for the 2018

Award in part because the committee thought that she would be stronger contender for the 2019

Award was pretextual because she was not ultimately selected for the 2019 Award, and Defendants

instead "selected (male) employees (including [Bearer's] male subordinate)." (Doc. 62 at 32.)

Finally, we observe that Bearer's non-selection for the Award occurred only two months after she

filed PHRC complaint, and that nominations for the Award were due four days after she filed it.[28]

Based upon the foregoing, we conclude that Bearer has satisfied her burden to "point to

some evidence, direct or circumstantial, from which a factfinder could reasonably . . . disbelieve

the employer's articulated legitimate reasons." *Fuentes*, 32 F.3d at 764. Teva's justification is

primarily based on its assertion, maintained throughout its briefing and statement of facts, that one

of the most important factors in determining President's Club Award winners is achieving

"tangible business results that can be directly tied to the employee's efforts within the organization,

like the successful launch of a new Teva product and the innovation upon or advancement of an

in-market Teva product." (Doc. 62-3 ¶ 151.) On this basis, Teva contends that Travis Kenney and

Dave Miley were more deserving of the award than Bearer due to Kenney's work on a new product,

---

[28] While this evidence is more directly related to making a showing of a causal link between the
protected activity and adverse action for a retaliation claim, the Third Circuit has instructed that
"nothing about the *McDonnell Douglas* formula requires us to ration the evidence between one
stage or the other," specifically in the context of considering the temporal proximity of allegedly
retaliatory actions to demonstrate pretext. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 286
(3d Cir. 2000); *see also Carlson v. Twp. of Lower Alloways Creek*, 452 F. App'x 95, 101 (3d Cir.
2011) (same).

Austedo, and Miley's innovation of an in-market product, GRANIX. (Doc. 52-2 at 36.) However, the only record evidence cited in support of these justifications is Keefe's Declaration. (Doc. 62-3 ¶ 155.) But Keefe's deposition testimony directly contradicts this assertion. He testified that, in addition to Travis Kenney, Adam Foote was selected for 2018 Award, not Dave Miley. Keefe Dep. 287:17–288:17. In doing so, he discussed that Foote's work on an in-market product, Copaxone, made him more deserving than Bearer's work on the yet-to-be-released Ajovy. Keefe Dep. 288:19–289:2. These dueling explanations, particularly in light of the lack of documentation on the subject, could permit a reasonable factfinder to disbelieve Teva's proffered justification.

There are further inconsistencies with Teva's proposed explanation. Teva stated in its response to an interrogatory that Mauk was responsible for selecting the 2018 Award winners. (Doc. 62-4 ¶ 220.) In line with its assertion that one of the most important factors is contribution to the launch of a new product or innovation of an in-market, the response stated that Mauk did not select Bearer because he determined that she would be a stronger contender for the 2019 Award, as the product she was working on, Ajovy, was set to launch in the 2018 fiscal year. (*Id.*) This interrogatory response is inconsistent with both Mauk's and Keefe's testimony. Mauk testified that he was involved in selecting or nominating employees for the 2018 Award, as he had done in previous years. Keefe testified that a committee he headed and that was made up of the Market Access senior leadership team, of which Mauk was no longer a part during the 2018 Award selection time period, was responsible for selecting the winners. Moreover, in addition to these consistencies regarding who the decisionmakers were, Teva's assertions that contribution to a new product is one of the most important factors, and that Bearer would have been a stronger contender

for the 2019 Award, are undercut by the fact that she did not win ultimately the 2019 Award despite that she led the successful launch of an important new product.[29]

Viewing this evidence in the light most favorable to Bearer, we conclude that she has satisfied her burden to show pretext in that she has pointed to sufficient circumstantial evidence from which a factfinder could reasonably disbelieve the Teva's articulated reasons for not selecting her for the 2018 President's Club Award. That is, a reasonable factfinder could conclude that contributing to the launch of a new product "did not have the importance [Teva] claims," and that its reliance on it to explain Kenney's and Miley's selection over her is merely a pretext. *See Goosby*, 228 F.3d at 320. This is particularly true here, where the criteria for the Award is subjective and there is no documentation of the decisionmaking process. *Id.*; *Johnson v. Verizon Servs. Corp.*, 2017 WL 1397240, at *4 (E.D. Pa. Apr. 18, 2017).

### B.   Hostile Work Environment

We now turn to address Teva's motion as to Bearer's hostile work environment claim. To make out a prima facie case of hostile work environment under Title VII, Bearer must show: "(1) intentional discrimination based on sex; (2) severe or pervasive conduct; (3) a detrimental effect on the plaintiff; (4) a detrimental effect on a reasonable person in similar circumstances; and (5) the existence of respondeat superior liability." *Chinery v. Am. Airlines*, 778 F. App'x 142, 145 (3d

---

[29] We acknowledge that in response to this argument Teva points out that while Bearer was not selected for the 2019 President's Club Award in February 2019, she was promoted to Senior Director in January 2019. Teva highlights that this promotion came with a nearly $15,000 raise, substantially more than the $5,000 bonus that accompanies the President's Club Award. However, we find that, if anything, her promotion to Senior Director just before the 2019 Award selection bolsters Bearer's argument. Indeed, that she was promoted in January 2019 only affirms that she was performing at a high level throughout 2018. Taken together, that she was performing at a high level and doing so in her role leading the launch of an important new Teva product, but still was not selected for the 2019 Award, further undercuts Teva's proffered justifications for not selecting her for the 2018 Award.

Cir. 2019) (citing *Mandel*, 706 F.3d at 167). To determine whether an environment is hostile, we "analyze the alleged harassment by 'looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998)). A hostile work environment is one that is "permeated with discriminatory intimidation, ridicule, and insult . . . that [is] sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Mazur v. Sw. Veterans Ctr.*, 803 F. App'x 657, 662 (3d Cir. 2020) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)) (internal quotation marks omitted).

In her brief, Bearer discusses the following allegations in support of her hostile work environment claim. First, she discusses the incident where Rob Koremans "slapped her buttocks" at an industry conference in September 2017. (Doc. 62 at 15–16.) She argues that this incident alone is sufficiently "severe" to satisfy her prima facie hostile work environment claim. Nonetheless, she contends that in addition to the Koremans incidents, the "boys' club" and "glass ceiling" at Teva contributed to a hostile work environment. Specifically, she argues that, "there was a boys' club (i.e., the all-male leadership team) from which she was excluded when she became employed at [Teva] due to their demonstrably close-knit interactions and discussions only among male managers in which she was not included." (Doc. 62 at 16.) She alleges that "[s]he continued to feel [excluded] throughout her employment, including as of around October 2015, when she complained to Keefe . . . that there was a "glass ceiling" and an "old boys' network" at [Teva], and that there was a lack of advancement opportunities for women." (*Id.*) Further, she argues that when she learned about the decision to promote Mauk instead of her into the position

Zabroske vacated, "she became very emotional and upset as it was the culmination of the old boys'
network, and one of the most discriminatory acts to which she had been subjected, up until that
point." (*Id.* at 16–17.) Further, she avers that she "complained repeatedly to Keefe about the fact
that there was a "glass ceiling" for women, including herself, at [Teva] and including in around
August 2017 (when she also complained to Keefe that women were underrepresented at [Teva]).
(Doc. 62 at 17.) In support of its motion, Teva first contends that certain of Bearer's allegations
are time-barred discrete acts that cannot contribute to a hostile work environment under a theory
of continuing violation.[30] Further, it contends that, notwithstanding any timeliness considerations,
Bearer has not alleged harassment that is sufficiently "severe and pervasive" to support a hostile
work environment claim.

### 1. Non-harassing conduct that does not contribute to hostile work environment

At the outset, we observe that many of the allegations Bearer puts forth in support of her
hostile work environment claim—which she argues should include "all" her allegations—are
simply "not a form of 'discriminatory intimidation, ridicule, [or] insult' that could give rise to a
hostile work environment claim." *Ramseur v. Perez*, 80 F. Supp. 3d 58, 78 (D.D.C. 2015), *aff'd*,
2015 WL 5210307 (D.C. Cir. Aug. 6, 2015) (citing *Harris*, 510 U.S. at 21) (alteration in original).
For example, Bearer's overarching allegation of a "glass ceiling" at Teva is primarily predicated
upon her individual allegations of instances where she was not promoted. But failure to be
promoted, without any indication that it is connected to hostile or abusive behavior, is simply not

---

[30] Specifically, Teva contends that Bearer's alleged failures to be promoted that occurred prior to
the statutory period cannot contribute to her hostile work environment claim, and that her
allegations regarding feeling excluded from the "boys' club" that predate the limitations period are
untimely. We address these concerns throughout our discussion.

a form of harassment that can contribute to a hostile work environment.[31] *See id.* ("[D]efendant's failure to promote plaintiff was not a form of "discriminatory intimidation, ridicule, [or] insult" that could give rise to a hostile work environment claim."); *Helvy v. Allegheny Cty.*, 2015 WL 672262, at *3 (W.D. Pa. Feb. 17, 2015) ("So, for example, if an employee is discriminatorily denied ten promotions over a period of time, that pattern of conduct may give rise to ten separate disparate treatment claims under Title VII, but it would not create a hostile work environment claim. . . . She will not be permitted to bootstrap her alleged discrete acts of discrimination and retaliation into a broader hostile work environment claim.") (internal citations, quotations, and alterations omitted); *Lampkins v. Mitra QSR KNE, LLC*, 383 F. Supp. 3d 315, 330 (D. Del. 2019) (quoting *Parker v. State of Del., Dep't of Pub. Safety*, 11 F. Supp. 2d 467, 476 (D. Del. 1998)) (distinguishing, on one hand, acts of "discriminatory intimidation, ridicule and insult" which "constitute sexual harassment" and can contribute to hostile work environment claims, from, on

---

[31] We acknowledge that our Court of Appeals has not addressed whether discrete acts that are independently actionable, such as failure to promote, are *per se* barred from contributing to a plaintiff's hostile work environment claim. *Kramer v. Franklin Covey Co*, 2021 WL 462344, at *6 (W.D. Pa. Feb. 9, 2021) ("Our Court of Appeals, however, has not adopted or had the occasion to address the doctrine."). Further, while we observe that many district courts within the Third Circuit that have addressed the question have held that such acts cannot contribute to a hostile work environment, *see id.* at *6 n.15 (collecting cases), we note that another Court of Appeals that has addressed the question squarely, including the reasoning upon which our sister district court's holdings were based, has ruled that under certain circumstances independently actionable acts can contribute to hostile work environment. *See Baird v. Gotbaum*, 662 F.3d 1246, 1252 (D.C. Cir. 2011) (reversing district court's grant of summary judgment and stating that district court's holding that "plaintiff cannot rely on the discrete acts upon which she bases her discrimination and retaliation claims to support her hostile work environment claim" was incorrect). Still, even the D.C. Circuit requires that, to be considered a component of a hostile work environment claim, an act, whether "discrete" and independently actionable or not, must be "adequately connected" to the "unlawful employment practice" making up the hostile work environment claim (*i.e.*, harassment). *Id.* Here, as Bearer has not pointed to any evidence to connect her failures to be promoted to any *harassment*, we are persuaded that it cannot contribute to her hostile work environment claim under either formulation of the rule.

the other hand, acts that do not involve harassment that instead "constitute disparate treatment"). Here, Bearer has not pointed to any evidence to connect any failure to promote her to any harassment she may have suffered. Accordingly, she cannot "bootstrap" her failure to promote claims into her hostile work environment claim simply by repackaging them under the heading of a "glass ceiling."[32] *See Helvy*, 2015 WL 672262, at *3.

## 2.   Conduct that contributes to hostile work environment

Bearer's remaining allegations related to her hostile work environment claim include her contention that there is a "boys' club" at Teva from which she felt excluded throughout her employment there, and the incident in which Koremans smacked her buttocks. First, with regard to the "boys' club," we observe that Bearer has alleged only that it consisted of "the close-knit relationship that existed among the [all-male leadership team]." (Doc. 62-4 ¶ 63.) She specifically identified the members of the "boys' club" as Larry Downey, Brendan O'Grady, George Keefe, John Zabroske, Bryan Mauk, Adam Foote, Marty Berndt, and John Miller. Bearer Dep. 35:7–37:22. While Bearer alleges the existence of a "boys' club culture," she does not allege that its members participated in any sexual harassment, inappropriate comments, or other behavior that one might typically associate with such a culture. Rather, she contends that she was made to feel excluded from the boys' club, but the only specific allegation she points to are situations such as once "at a meeting in which there were conversations with the male managers about issues of which [she] was unaware and not a part." (Doc. 62-4 ¶ 63.) Further, she alleges that the existence of the boys' club resulted in a lack of advancement opportunities for women (including her), and

---

[32] As we have determined that Bearer's allegations of failure to promote are not within the type of conduct that can contribute to a hostile work environment, it is unnecessary for us to address Teva's argument that certain of these incidents were time-barred from consideration as part of a hostile work environment claim.

the feeling among women that "they had to prove themselves more than male employees did." (Doc. 62 at 5.) While this evidence alone is neither sufficiently severe nor pervasive enough to support a hostile work environment claim, we view it in the aggregate along with Bearer's other allegations.[33]

Next, Bearer alleges, and Teva does not dispute, the following circumstances of the Koremans butt-smacking incident. Koremans was one of Teva's highest ranking executives, the President and CEO of Global Specialty Medicines, and he was several levels of reporting higher than Bearer. (Doc. 62-4 ¶ 166.) He was based out of Teva's Amsterdam office, and Bearer infrequently interacted with him and rarely, if ever, had extensive interaction with him. Bearer Dep. 61:12–13; 304:17–307:11. The incident at issue occurred on September 8, 2017, at an industry conference in Vancouver, Canada.  (Doc. 62-4 ¶ 165.) During a cocktail reception at the conference, Bearer approached Koremans with the intention of introducing him to an employee who reported to her, Yousseff Khan. (Doc. 62-4 ¶ 166.) After she, Koremans, and Khan spoke for a few minutes, she and Khan turned to walk away, and "Koremans slapped [Bearer] on the butt." (Doc. 62-4 ¶ 167.) "The slap was 'very, very firm' and audible." (Doc. 62-4 ¶ 168.) After the slap

---

[33] We acknowledge but reject Teva's argument that these "boys' club" allegations are time-barred from consideration in support of her hostile work environment claim. These allegations are properly considered under the continuing violations doctrine. Under that doctrine, "discriminatory acts that are not individually actionable may be aggregated to make out a hostile work environment claim; such acts 'can occur at any time so long as they are linked in a pattern of actions which continues into the applicable limitations period.'" *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 165 (3d Cir. 2013) (quoting *O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir. 2006)). To determine whether untimely incidents are sufficiently linked to timely ones to be a continuing violation, we consider the subject matter and frequency of the underlying acts. *Id.* at 166. Here, Bearer complained about the boys' club several times both before and after the limitations period. Each of these complaints related to similar conduct by the same group of individuals, and she contends that it occurred constantly throughout her employment. These allegations—not excluding Teva's inconsistent explanations regarding Bearer's non-receipt of the President's Award—are therefore properly considered as part of her hostile work environment claim under a theory of continuing violation.

and out of earshot of Koremans, Bearer asked Khan whether he had seen what just happened. Bearer Dep. 364:24–365:4. Khan responded that he had seen it, and he asked Bearer "what was that about?" *Id.* The next day, Bearer and Koremans were attending the same conference, and he "looked at her, made eye contact with her, and then winked at her." (Doc. 62-4 ¶ 171.) Bearer understood this wink to be a sexual advance. (Doc. 62-4 ¶ 172.)

After the conference, a "couple of days" later, Bearer reported the incident with Koremans, as well as her general complaints of a "boys' club" and "glass ceiling," to Teva's human resources department ("HR"). (Doc. 62-4 ¶ 173.) Her complaints were referred to Maureen Field and Indiya Hynd, with Field handling the "boys' club" and "glass ceiling complaints," and Hynd handling the Koremans incident. (Doc. 62-4 ¶ 179, 183.) Over the course of the next several weeks, Bearer had in-person meetings and email communication with Field and Hynd. In these meetings, she "explained the immense stress [she was] experiencing related to the [Koremans] incident as well as the overall work environment." (Doc. 62-4 ¶ 186.) She also forwarded some of her email communications with HR to Keefe, making him aware of her complaints. (Doc. 62-4 ¶ 188.) In communications with both HR and Keefe, she requested that Koremans not attend an upcoming meeting during her presentation.[34] (Doc. 62-4 ¶ 187–88.) Despite this request, Koremans attended the meeting and was in the audience during her presentation, but he did not make eye contact or otherwise interact with her at the meeting. Bearer Dep. 398:6–12; 399:21–400:3. Koremans left Teva in late 2017 or early 2018. Bearer Dep. 405:8–12. Teva ultimately did not take any action as a result of its investigation into the Koremans incident. (Doc. 62-4 ¶ 202.) Bearer does not allege

---

[34] Keefe stated that he knew of Bearer's request to remove Koremans from the meeting, and that he even offered to present in her stead. Keefe Dep. 271:15-24. Keefe was not, however, aware of any actions, if any, taken by HR to honor Bearer's wishes. Keefe Dep. 272:1-24. He further stated that the only person at Teva with the authority to bar Koremans' attendance at the meeting was Teva's CEO, and Keefe doubted the he was made aware of the "situation." Keefe Dep. 274:1-17.

that Koremans, or any other Teva employee, sexually harassed her, or otherwise acted inappropriately toward her, other than the incident described here. (Doc. 62-3 ¶ 135.) Teva argues that this incident is not sufficiently "severe or pervasive" to support a hostile work environment claim. (Doc. 52-2 at 19.) Bearer contends that "a single incident of offensive touching" is sufficiently "severe."

Conduct is "severe or pervasive" when it is "sufficient 'to alter the conditions of [the employee's] employment and create an abusive working environment.'" *Moody v. Atlantic City Board of Education*, 870 F.3d 206, 214 (3d Cir. 2017) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). "Extremely serious" isolated incidents are sufficient to sustain a hostile work environment claim. *Chinery*, 778 F. App'x at 145 (citing *Castleberry v. STI Grp.* 863 F.3d 259, 264 (3d Cir. 2017)); *Shatzer v. Rite Aid Corp.*, 2015 WL 4879450, at *5 (W.D. Pa. Aug. 14, 2015) ("[I]t has been held that isolated instances of sexually-charged conduct, if sufficiently severe, can satisfy the second prong."). To determine whether a work environment is hostile or abusive, we consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Faragher*, 524 U.S. at 787–88).

Here, we find that a reasonable jury could conclude that the conduct to which Bearer was subject, and the context of that conduct, was sufficiently "severe" to sustain her hostile work environment claim. In reaching this determination, we have carefully considered the Third Circuit precedent that Teva references in support of its motion, particularly the Court of Appeals ruling in *Clayton v. City of Atl. City*, 538 F. App'x 124 (3d Cir. 2013). While we acknowledge that the court there found that conduct was not "severe or pervasive" where it included, *inter alia*, one of

plaintiff's supervisors "grabb[ing] [her] buttocks and comment[ing] that 'that's the only thing she

has going for her.'" *id.* at 126, however, we also observe the Supreme Court's instruction that:

> [The severe or pervasive] inquiry requires careful consideration of the social
> context in which particular behavior occurs and is experienced by its target. A
> professional football player's working environment is not severely or pervasively
> abusive, for example, if the coach smacks him on the buttocks as he heads onto the
> field—even if the same behavior would reasonably be experienced as abusive by
> the coach's secretary (male or female) back at the office. The real social impact of
> workplace behavior often depends on a constellation of surrounding circumstances,
> expectations, and relationships which are not fully captured by a simple recitation
> of the words used or the physical acts performed. Common sense, and an
> appropriate sensitivity to social context, will enable courts and juries to distinguish
> between simple teasing or roughhousing . . . and conduct which a reasonable person
> in the plaintiff's position would find severely hostile or abusive.

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81–82, (1998). Context matters.[35] In

*Clayton*, the Third Circuit noted that the plaintiff had testified that she and the particular superior

officer who was responsible for much of the harassment "were friends" and would often dine and

vacation together with each other's respective families. *Clayton*, 538 F. App'x at 126 n.2. In fact,

at least one district court has distinguished *Clayton* on this ground. *See Paige v. Atrion Commc'n*

*Res., Inc.*, 2019 WL 5846799, at *8 (D.N.J. Nov. 7, 2019).[36]

    Here, to the contrary, one of Teva's highest level executives, a man whom Bearer barely

knew in a professional capacity, let alone in a personal capacity, inappropriately and offensively

---

[35] Notably, the plaintiff in *Clayton* admitted that other than "a few sporadic incidents over the
course of several years," the culture of her workplace was one that generally treated employees
equally regardless of gender. *Clayton*, 538 F. App'x at 127, 129. In contrast, Bearer has stated that
Koremans's conduct occurred against the backdrop of a work environment at Teva that was a
"boys' club," with a "glass ceiling" that disproportionately affected the career advancement of
women.

[36] While we acknowledge that the Court of Appeals only commented upon the relationship the
Clayton plaintiff had with one of her harassers, the court was silent as to whether there was an
outside relationship with any of her other harassers, and we will not speculate as to the context in
which the other harassment occurred.

touched an intimate area of her body, without any indication whatsoever that any such conduct was invited, and in doing so committed a sexual battery against her. *Vergara v. Keyes*, 2020 WL 7778080, at *1 (D.N.J. Dec. 30, 2020) ("sexual battery" where defendants "forcefully slapped [plaintiff's] buttocks"). He did so, brazenly, in the plain view of one of Bearer's subordinates. Undoubtedly, such conduct is "physically threatening [and] humiliating." *Faragher*, 524 U.S. at 787–88. Further, Koremans's conduct was compounded the very next day when he winked at Bearer, in what she reasonably interpreted as a sexual advance or proposition. To make matters worse, approximately two months later, Bearer learned that Koremans would attend a presentation she was giving, despite her request that he not be.

Sexual battery is one of the most serious forms of workplace sexual harassment to which one could be subjected. We acknowledge that Teva has referenced three district court opinions that it contends involve comparable or more serious conduct that was held not to be "severe or pervasive." However, we observe that one of these cases involves conduct that appears to be less severe than that presently before us, *Larochelle v. Wilmac Corp.*, 210 F. Supp. 3d 658, 684 (E.D. Pa. 2016), and that the other two were decided more than two decades ago. *Saidu–Kamara v. Parkway Corp.*, 155 F.Supp.2d 436, 439–40 (E.D. Pa. 2001); *Bauder v. Wackenhut Corp.*, 2000 WL 340191 at *4 (E.D. Pa. Mar. 23, 2000). Further, to the extent that there are other district court opinions that would support holding that a sexual battery at the hands of one of the most powerful men within Teva's corporate umbrella, with whom Bearer had no personal relationship, and that occurred directly in front of one of her subordinates, is not "severe," we believe that the context of this case warrants a different outcome.[37] Viewing the evidence in the light most favorable to

---

[37] We note that none of the cases that Defendants cited in their memorandum had similar context to that in this case, namely, a "boys' club" workplace atmosphere coupled with an extensive train of discriminatory acts. Bearer alleges a severe instance of sexual battery by one of her company's

Bearer, we conclude that a reasonable jury could find that this conduct is sufficiently "severe" to sustain a hostile work environment claim, and that she is therefore entitled to have a jury make that determination. For these reasons, summary judgement is denied as to her hostile work environment claim.

## IV.   CONCLUSION

For the foregoing reasons, summary judgment is granted in part and denied in part. An appropriate order follows.

---

highest executives as the "crescendo" or "the final straw" of a long "evolution of events" related to years of sex discrimination at Teva, rather than a single instance of inappropriate behavior in an otherwise "normal" work environment. (Doc. 62-3 ¶ 132.) *Cf. Clayton,* 538 F. App'x at 129 (plaintiff admitted that work environment was generally equal and gender-neutral aside from sporadic incidents of sexual harassment); *LaRochelle v. Wilmac Corp.*, 210 F. Supp. 3d 658, 684 (E.D. Pa. 2016) (several occasions of unwanted comments and touching, alone, were insufficient for a hostile work environment claim); *Saidu Kamara v. Parkway Corp.*, 155 F. Supp. 2d 436 (E.D. Pa. 2001) (five isolated incidents of sexual harassment over the course of eighteen months could not support hostile work environment claim); *Bauder v. Wackenhut Corp.*, 2000 WL 340191, at *4 (E.D. Pa. Mar. 23, 2000) (four "offhand" incidents of inappropriate behavior by an employer did not amount to "severe or pervasive" conduct).